[No. 13583-7-III.    Division Three.    July 14, 1994.]

THE STATE OF WASHINGTON, *Respondent,* v. CURTIS SCOTT BUCKNER, *Appellant.*

*John A. Troberg,* for appellant.

*John G. Wetle, Prosecuting Attorney,* for respondent.

SCHULTHEIS, J. — Curtis Scott Buckner was convicted of first degree felony murder and given an exceptional sentence of 960 months. Mr. Buckner contends: (1) DNA comparison evidence is not sufficiently reliable to be admissible; (2) the trial court erred in admitting rebuttal evidence; (3) the prosecution failed to preserve test samples; (4) a change of venue should have been granted; and (5) the exceptional sentence is unwarranted. We affirm on the first four grounds but remand for resentencing.

On January 10, 1988, Cynthia Ferguson's vehicle was found abandoned on a logging road and reported by passing snowmobilers as possibly stolen. Police found blood in and around the vehicle and a search of the area revealed Ms. Ferguson's snow-covered body nearby. She had been stabbed 15 times at another location and transported to where her body was found. Naked except for socks, she appeared to have been raped. A blood sample was taken as were semen swabs. Suspicion fell on Mr. Buckner. He was seen in the area the day of the incident and was known to own a knife similar to the murder weapon found at the scene. Police obtained a warrant for a blood sample. Samples from Mr.

Buckner and the victim were sent to the state crime laboratory for analysis. Results proved inconclusive and samples were sent to a private laboratory for DNA typing. Mr. Buckner secured leave to test using his own expert. The results were not helpful to the defense. Mr. Buckner selected another laboratory, but there were insufficient sample materials left to obtain a result.

The jury convicted. At sentencing, the court departed from the standard range of 291 to 388 months and imposed an exceptional sentence of 960 months.

Now that our Supreme Court has addressed the reliability of DNA typing, Mr. Buckner's challenge is no longer viable. *State v. Cauthron*, 120 Wn.2d 879, 846 P.2d 502 (1993). The methodology employed here is the same as that addressed in *Cauthron*. Dr. Michael Baird of Lifecodes Corporation stated the odds of the semen taken from the victim coming from anyone other than Mr. Buckner were 1 in 19 billion. Dr. Mary Clair King, another prosecution expert, thought this estimate conservative. Since there are not 19 billion persons living today, this is another way of saying the match was absolute — a practice arguably condemned by *Cauthron*. 120 Wn.2d at 906. Dr. King went further and stated, "In my view, there's absolutely no doubt those two samples came from the same human being." Prior to delivering this opinion, she gave the jury an overview of population genetics theory and described the process whereby weight is assigned to test results and how the weights are factored to arrive at a statistical conclusion.

■ If *Cauthron* were read as authority for the premise that a DNA expert cannot testify to conclusivity, the rule was violated. If read as authority that an opinion without statistical support is not helpful to the trier of fact, no violation occurred. *See* 120 Wn.2d at 906-07. We adopt the latter view.

■ Mr. Buckner also raises evidentiary questions relative to DNA. The trial court excluded consideration of alleged testing errors at the *Frye* hearing.[1] Although *Cauthron* left

---

[1] *Frye v. United States*, 293 F. 1013, 34 A.L.R. 145 (D.C. Cir. 1923).

the door open for a determination of testing errors as a matter of law, the question is generally for the trier of fact. 120 Wn.2d at 898-99; *see also State v. Kalakosky*, 121 Wn.2d 525, 543, 852 P.2d 1064 (1993).

Mr. Buckner urges that certain exhibits introduced in rebuttal were significantly different from the materials presented during the State's case in chief because they involved rehybridized test gels for which no foundation was laid during the *Frye* hearing.[2] He also urges no statistical evidence was introduced explaining the significance of the exhibits. He argues this material was cumulative and not designed to rebut anything produced by the defense.

Dr. Baird analyzed seven autoradiograms (autorads) of four test probes, each of which he concluded established a match. Dr. Randall Libby, a defense expert, was critical of Lifecodes' protocols and opined that two of the four asserted matches did not match. Casting out the nonmatches, the odds of anyone else exhibiting the same DNA pattern would fall from Dr. Baird's estimate of 1 in 19 billion to 1 in 325,312. In rebuttal, the State sought to introduce additional autorads of rehybridized test gels and Mr. Buckner objected on the basis that no foundation had been laid establishing this process was generally accepted by the scientific community. The objection was sustained in part and overruled in part. Dr. Baird testified the results were consistent with his earlier testimony. He stated the rebuttal evidence could not be used to determine a match. The rehybridization process was employed only to confirm the accuracy of Lifecodes' earlier work.

■ A trial court's decision to admit or reject rebuttal evidence will be disturbed only upon a showing of manifest abuse of discretion. *State v. Swan*, 114 Wn.2d 613, 652-53, 790 P.2d 610 (1990), *cert. denied*, 498 U.S. 1046 (1991). In response to counsel's objection, the trial judge declined to accept some evidence, holding it did not meet *Frye* standards as determined in the prior hearing, and accepted the evi-

---

[2]We assume familiarity on the reader's part with the DNA typing process. *See Cauthron*, at 891-908.

dence to which Mr. Buckner objects. Manifest abuse of discretion does not appear on the record cited. The evidence was cumulative to some extent, but Dr. Baird's testimony was offered to rebut Dr. Libby's suggestions of error and is thus relevant.

Mr. Buckner contends the State should have recognized that with the admissibility of DNA evidence unsettled, and the science of forensic typing still in an embryonic stage, multiple testing procedures might be indicated. Accordingly, a greater quantity of sample should have been preserved. Mr. Buckner relies on *State v. Wright*, 87 Wn.2d 783, 557 P.2d 1 (1976) for the premise that when evidence is lost or destroyed, the focus is on materiality. To the extent the decision interprets federal constitutional principles, *Wright* is no longer good law. *State v. Straka*, 116 Wn.2d 859, 882-83, 810 P.2d 888 (1991). Nor, when this matter was argued, did our state constitution compel a different result. *State v. Ortiz*, 119 Wn.2d 294, 301-05, 831 P.2d 1060 (1992) (plurality) (adopting *Arizona v. Youngblood*, 488 U.S. 51, 102 L. Ed. 2d 281, 109 S. Ct. 333 (1988)). Postargument, however, a decision issued which indicates the law is unsettled. *State v. Hanna*, 123 Wn.2d 704, 871 P.2d 135 (1994). *Hanna*, at 713-14, adopted no test, but strongly suggests that *Ortiz* is displaced:

> The law governing destruction of evidence cases is not settled in Washington. *See State v. Ortiz*, 119 Wn.2d 294, 831 P.2d 1060 (1992). This court is split as to whether the standard set forth in *Arizona v. Youngblood*, 488 U.S. 51, 102 L. Ed. 2d 281, 109 S. Ct. 333 (1988), or that enunciated in *State v. Vaster*, 99 Wn.2d 44, 659 P.2d 528 (1983), is controlling.

> In *Youngblood*, the Supreme Court held "unless a criminal defendant can show bad faith on the part of the police, failure to preserve potentially useful evidence does not constitute a denial of due process of law." *Youngblood*, 488 U.S. at 58. In *Vaster*, we articulated a 2-part balancing test. "[A] court should first consider whether there exists a reasonable possibility that the missing evidence would have affected the defendant's ability to present a defense." *Vaster*, 99 Wn.2d at 52. The defendant bears the burden of establishing that reasonable possibility. *Vaster*, 99 Wn.2d at 52. Then, "the court must balance the consideration of 'reasonableness' against the ability of the

prosecution to have preserved the evidence." *Vaster*, 99 Wn.2d at 52.

We decline to adopt either standard in this case because the trial court's denial of Hanna's motion to dismiss would be affirmed under either approach.

(Italics omitted.)

■ This is not a typical "loss or destruction" case. Evidence was neither lost nor destroyed. The prosecution had a sufficient sample for its own purposes and saved enough so the defense could conduct independent testing. There is no hint of bad faith. Nor is there reason to believe a second, third, or fourth test would have been any more helpful than was the first.

■ In his pro se brief, Mr. Buckner urges the events underlying the charge were highly publicized in sparsely populated Stevens County, not only because of the nature of the crime, but because this was the first DNA prosecution in the state. According to Mr. Buckner, inflammatory and pervasive media coverage rendered it impossible to select an impartial jury and the court erred in rejecting his motion for a change of venue. This issue cannot be reached. Presumably, supporting material accompanied the motion which described the nature and timing of publicity. This material, however, was not designated. There is nothing in the record allowing the nine factors set forth in *State v. Rupe*, 101 Wn.2d 664, 675, 683 P.2d 571 (1984) to be weighed.

Turning to sentencing issues, Mr. Buckner urges his criminal history does not reflect any prior sex crimes. His adult history of violent crime is confined to a single assault charge and is not the sort of indicator of future dangerousness contemplated by the case law. The crime was brutal, but by its nature murder is always brutal. Moreover, felony murder is not a "sex offense". Finally, the trial court impermissibly considered the effect of good time in fixing the sentence.

The State counters that from the age of 15 forward, Mr. Buckner built a record of increasingly callous disregard for others. He graduated in rapid progression over the span of 6

years from minor property crimes to major property crimes to assault to murder. He stood convicted of 12 felonies at the time of sentencing. The only reason the conviction for assault was not a conviction for murder was because when the victim's skull was shattered with a hammer, bone fragments stemmed the flow of blood allowing time for her to secure medical aid. According to the State, enhancement was justified based on Mr. Buckner's deliberate cruelty, future dangerousness, heinous conduct and his pattern of escalating violence.

■ On review of an exceptional sentence, an appellate court will consider: (1) whether the trial court's reasons for departure are supported by the record; (2) whether the reasons justify the sentence imposed; and (3) whether the sentence was clearly too lenient or clearly too excessive. *State v. Pryor*, 115 Wn.2d 445, 450, 799 P.2d 244 (1990). The first prong is tested under the clearly erroneous standard, the second is reviewed de novo as a matter of law and the third is tested for abuse of discretion. *Pryor*, at 450.

The trial court considered deliberate cruelty and held that 15 separate but tightly grouped stabbings evidence not only an intent to kill, but to do so cruelly. Also taken into account was the dehumanizing rape of a dying or dead woman. The court considered Mr. Buckner's demonstrated pattern of escalating violence and found the progression unmistakable.[3] The court also found that if released under a standard range sentence at a relatively young age he would certainly return to violence and thus posed and would continue to pose a danger to the community.

■ Deliberate cruelty contemplates acts not usually associated with the commission of the offense. *State v. Payne*, 45 Wn. App. 528, 531, 726 P.2d 997 (1986). Murder necessarily involves extreme violence, but not necessarily brutal torturous violence where a victim is stabbed repeat-

---

[3]The pattern of escalating violence is relevant to the future dangerousness issue, but the State cites no authority supporting its position that a pattern of increased violence standing alone is an enhancement factor. There does not appear to be any such authority. *State v. Ross*, 71 Wn. App. 556, 566, 861 P.2d 473 (1993).

edly and left to die leisurely. *See State v. Crane*, 116 Wn.2d 315, 334, 804 P.2d 10 (multiple injuries in the course of single assault may evidence deliberate cruelty), *cert. denied*, 501 U.S. 1237, 115 L. Ed. 2d 1033, 111 S. Ct. 2867 (1991). The trial court did not err in finding cruelty of a nature beyond that normally committed as part and parcel of the crime charged. RCW 9.94A.390(2)(a).

■ A demonstrated propensity for future violence may warrant an exceptional sentence if the finding is supported by the record with a showing of prior similar acts and a lack of amenability to treatment. *Pryor*, 115 Wn.2d at 453-54. *Pryor* is now confined to sex offenses. *State v. Barnes*, 117 Wn.2d 701, 708-12, 818 P.2d 1088 (1991). The question becomes, is felony murder with the predicate felony being rape a sex offense. Mr. Buckner urges the term "sex offense" refers only to those offenses defined by RCW 9.94A.120(7) for which a rehabilitative alternative to incarceration is available. If so, a serious crime of violence involving sex is not a sex offense because it is carved out by operation of RCW 9.94A.120(7)(a)(i). This construction is inconsistent with the Sentencing Reform Act of 1981 (SRA) which defines "sex offense" as all felonies included in RCW 9A.44 plus several others of an inherently sexual nature. The statute in effect during the relevant time frame provided:

"Sex offense" means:

(a) A felony that is a violation of chapter 9A.44 RCW or RCW 9A.64.020 or 9.68A.090 or that is, under chapter 9A.28 RCW, a criminal attempt, criminal solicitation, or criminal conspiracy to commit such crimes; . . .

Former RCW 9.94A.030(23).

Mr. Buckner was charged under RCW 9A.32.030(1)(c), a statute not referenced in former RCW 9.94A.030(23). It is well settled that each element of the predicate offense must be proved to support the crime of felony murder. *State v. Maupin*, 63 Wn. App. 887, 892, 822 P.2d 355, *review denied*, 119 Wn.2d 1003 (1992). The jury necessarily found Mr. Buckner committed all essential acts necessary for conviction of rape in violation of RCW 9A.44.040. He was not

convicted of rape only because the State charged a single count of felony murder rather than split the charges. He was therefore convicted under a statute not enumerated in former RCW 9.94A.030(23), but was convicted of a "felony that is a violation of chapter 9A.44 RCW . . ." because the elements of the rape charge were subsumed into the murder charge and became necessary elements of the latter. Accordingly, Mr. Buckner was convicted of a sex offense and falls within the rule of *Pryor*.[4]

The trial court had an ample basis upon which to find a pattern of increasingly vicious conduct. Missing are findings of prior sexual deviancy and lack of amenability to treatment, both of which are required. *Pryor*, 115 Wn.2d at 455. As to deviancy, so far as the record reveals, Ms. Ferguson was Mr. Buckner's first victim in which sex played a role. There is a suggestion he demonstrated an affinity for women's underwear in connection with several past crimes, but the record is in no way adequate to support a history of deviancy. Equally fatal is the failure to take evidence on amenability to treatment. "At the minimum the trial court must have before it, in addition to a history of similar acts of sexual deviancy, the opinion of a mental health professional that the defendant would likely not be amenable to treatment." *Pryor*, 115 Wn.2d at 455; *accord State v. Strauss*, 119 Wn.2d 401, 420-21, 832 P.2d 78 (1992).

Finally, the trial court relied on an impermissible basis for the enhancement decision:

> [F]or the record, I'm going to tell you how I arrived at an appropriate sentence. I arrive at an appropriate sentence by looking at your age, and by looking at your criminal history — and I don't mean counting points now, the specific crimes; I'm talking about the threat to the community, I'm talking about the violence of the crime, I'm talking about all those things.

---

[4]Division One has adopted a test which would shorten this analysis considerably. Rejecting the idea that sex crimes are only those enumerated in the SRA, the court adopted the "commonsense perspective" test in which the accused's acts are viewed in light of what he actually did. *State v. Stewart*, 72 Wn. App. 885, 895, 866 P.2d 677, *review granted*, 124 Wn.2d 1008 (1994). If he violated a facially nonsexual statute in a sexual manner and was motivated by sexual gratification, the offense is a sex crime. *Stewart*, at 895-96. Even under the more conservative analysis in the text, Mr. Buckner clearly committed a sex crime.

And I do not think, sir, that it is prudent nor will society be safe for you to be released before approximately your 75th year. And for the court, then, to reach that calculation, and realizing I do not have a perfect crystal ball, I note that with your age and with one-third off for good behavior, a sentence of 80 years in the Washington State Correction system will accomplish this end.

■ An analysis of this nature is not permitted. *State v. Fisher*, 108 Wn.2d 419, 429 n.6, 739 P.2d 683 (1987). Good time plays no role until confinement begins and credits are earned. RCW 9.94A.150(1). There is no guaranty credits will ever be earned, either because the prisoner fails to qualify or because the Legislature alters the rules. *State v. Ross*, 71 Wn. App. 556, 573, 861 P.2d 473 (1993).

The trial court correctly found enhancement justified because of the cruelty with which the offense was committed. The court erred in finding future dangerousness. It was also error to calculate good time credit in setting the length of sentence.

■ The record does not reflect the weight assigned to each of the bases for departure, but it seems evident the potential for future violence weighed heavily. Accordingly, vacation of the sentence and remand for resentencing is indicated. *Barnes*, 117 Wn.2d at 712; *Pryor*, 115 Wn.2d at 456. We express no opinion on whether the 80-year sentence is clearly excessive. To do so at this juncture would be to render an advisory opinion on a record which has yet to be completed. Nor do we express an opinion on whether a sentence geared to coincide with a defendant's actuarial life expectancy is the functional equivalent of life without parole, and if so, whether the result is permissible. *See Ross*, 71 Wn. App. at 573-75.

Affirmed in part and remanded for resentencing.

THOMPSON, C.J., and MUNSON, J., concur.