[No. 62043-1.   En Banc.   March 16, 1995.]

THE STATE OF WASHINGTON, *Respondent*, v. CURTIS SCOTT BUCKNER, *Petitioner*.

*John A. Troberg,* for petitioner.
*John G. Wetle, Prosecuting Attorney,* for respondent.

PER CURIAM. — We granted Curtis Buckner's Petition for Review of a Court of Appeals decision affirming his first degree murder conviction. *State v. Buckner,* 74 Wn. App. 889, 876 P.2d 910 (1994). We considered the matter without oral argument pursuant to RAP 11.6, and find no merit in Buckner's claims regarding the general admissibility of DNA evidence and destruction of evidence. However, we reverse and remand to the Superior Court for further proceedings in light of our opinion in *State v. Cauthron,* 120 Wn.2d 879, 899-909, 846 P.2d 502 (1993).

## BACKGROUND

Relevant facts are narrated in the opinion below. Briefly, on January 10, 1988, a group of snowmobilers found Cynthia Ferguson's pickup truck parked on a logging road. Her body was found nearby. She had been stabbed 15 times in the neck with a narrow double-edged knife. She appeared to have been raped. The knife was later found about 50 feet from the body.

Several witnesses had seen Buckner walking in the roadway near where the body was found, and one of these said Buckner had been carrying a knife identical to the knife found near Ferguson's body. A blood sample and semen swabs were taken. Buckner was questioned by police, who obtained a warrant to take a blood sample. The sample was sent to the State Crime Laboratory, along with a sample of Ferguson's blood and the swabs. The State later sent swabs and samples of Ferguson's and Buckner's blood to a laboratory called Lifecodes for DNA testing. In March 1988, Lifecodes reported that the male DNA found on the vaginal swabs matched the DNA in Buckner's blood.

At trial, geneticist Michael Baird from Lifecodes testified that there were several "matching pattern[s]" between the vaginal sample taken from Ferguson's body and Buckner's blood sample. Trial Report of Proceedings, at 486-87. Baird also testified that the particular combination of patterns in both of the two identified samples would occur in only one Caucasian in 19.25 billion. He concluded that "[t]hey do match". The jury ultimately found Buckner guilty of first degree felony murder. The Court of Appeals affirmed Buckner's conviction but vacated his exceptional sentence as based, in part, on impermissible factors.

### ANALYSIS

In *Cauthron* we held the restricted fragment length polymorphism (RFLP) method of DNA typing admissible under the *Frye* standard. *See generally State v. Cauthron, supra; Frye v. United States*, 293 F. 1013, 1014, 34 A.L.R. 145 (D.C. Cir. 1923). However, we also found "significant disagreement within the scientific community regarding the validity of the databases used to construct the probability estimates which ultimately determine identity." *Cauthron,* 120 Wn.2d at 886. As a result, we cautioned that " '[r]egardless of the calculated frequency, an expert should . . . avoid assertions in court that a particular genotype is unique in the population.' " *Cauthron,* 120 Wn.2d at 907 (quoting Committee on DNA Technology in Forensic Science, *DNA Technology in Forensic Science* 92 (National Academy Press 1992)).

We noted that substantial controversy has arisen in the scientific community concerning the methods used for estimating population frequencies of specific DNA patterns. *Cauthron*, 120 Wn.2d at 902-03. All such statistics are based on four assumptions, each of which must be correct in order for the stated probability of a "match" to be accurate. These assumptions are (1) the appropriate genetic population with which to compare the sample has been accurately identified; (2) the sample is large enough to account for the possibility of error; (3) the sample must be truly random; (4) most importantly, the population must be mixed such that each position of DNA tested is in "Hardy-Weinberg equilibrium". *Cauthron*, 120 Wn.2d at 903-04. Because some DNA laboratories have apparently based their statistical models on one or more incorrect assumptions, "[c]ourts in other jurisdictions have expressed reservations about statistical evidence in DNA cases." *Cauthron*, 120 Wn.2d at 905 (citing several cases).

We did not hold that DNA evidence is inadmissible because of these identified difficulties with the statistical models. We noted that the Committee on DNA Technology in Forensic Science had "set out a method for accounting for the possibility of population substructuring, called the ceiling principle." *Cauthron*, 120 Wn.2d at 908. That principle is a method of providing a conservative estimate of the population frequency of DNA patterns. Applying this principle can underestimate the likelihood that the defendant is the source of the DNA found in the forensic sample, but will not overestimate the likelihood. We noted that the adoption of this method by the Committee "indicates that sufficient acceptance within the scientific community has been achieved to satisfy *Frye* in appropriate circumstances." *Cauthron*, 120 Wn.2d at 908.

Thus, while *Cauthron* does hold that "match" testimony is by itself not helpful to the trier of fact, it also disapproves of informing the jury that "match" means "unique in the population". *Cauthron*, 120 Wn.2d at 907. Rather, once the proper statistical foundation is laid (in a hearing outside the jury's

presence), the expert should be permitted to describe the test results to the jury using the Committee's "ceiling principle" or another statistical model proved to be accepted in the scientific community.

The expert here testified that Buckner's DNA is a 1 in 19.25 billion "match" to the forensic sample. Since this figure is almost four times the present population of the earth, the jury was told, contrary to *Cauthron*, that the match was unique in the population. We reverse and remand to the Superior Court for further proceedings in the light of *Cauthron* and this opinion.

Reconsideration granted November 5, 1996.