925 P.2d 183 (1996)
130 Wash.2d 464
The STATE of Washington, Respondent,
v.
Marilyn WAKEFIELD, Petitioner.
No. 63085-2.
Supreme Court of Washington, En Banc.
Argued January 18, 1996.
Decided October 24, 1996.
*184 Nielsen & Acosta, Eric Broman, Seattle, for petitioner.
Norm Maleng, King County Prosecutor, Kristin V. Richardson, Deputy Prosecutor, Seattle, for respondent.
DURHAM, Chief Justice.
Defendant Marilyn Wakefield pleaded guilty to first degree manslaughter after the trial court indicated during plea negotiations that it would sentence her within the standard sentencing range. At the sentencing phase of trial, the court nonetheless imposed the statutory maximum penalty instead of a standard range sentence. Wakefield contends, inter alia, that her plea was involuntary and that the only adequate remedy is to remand her case for resentencing within the standard range. The Court of Appeals rejected this argument, but nevertheless held that Wakefield could withdraw her plea since she may have been misled by the trial court. We affirm.

*185 FACTS
On June 29, 1992, 52-year-old Marilyn Wakefield was charged with second degree murder in the death of 40-year-old Robert Brockman. Wakefield had worked as Brockman's live-in caregiver since 1991. Brockman was paralyzed from the neck down as the result of a 1986 motorcycle accident and confined to a battery operated wheelchair. He wore a neck brace with a lever near his chin that allowed him to maneuver the wheelchair. Brockman could not turn the wheelchair on and off, and relied on someone else to do this for him.
In late May 1992, Brockman's brother became worried after calling him for several days but receiving no answer. At the behest of his father, he went to Brockman's apartment along with police on June 6, 1992. Upon arriving, they immediately noticed a blanket covering the bedroom window where Brockman spent most of his time. All of the windows and doors to Brockman's apartment were locked and his van was missing. Brockman was found dead in his bedroom, still sitting in his wheelchair. His head brace had been removed and placed in his lap. His wheelchair had been turned off. A pillow case was draped over his head, approximately to the bridge of his nose. Although Wakefield was missing, she had closed Brockman's bank account the previous day. The coroner conducted an autopsy and determined that Brockman probably asphyxiated.[1] He estimated that Brockman died on June 1, 1992.
Wakefield's sister contacted police regarding a letter she had received from Wakefield. The letter, dated June 3, 1992, begins with Wakefield confessing to the murder.
It's all ended in disaster. I did a terrible thing. I killed himthe man I worked for, Bob4 days ago. I did that to him. I'm turning myself in tomorrow. I know for sure now that I'm crazy, crazy, crazy.
Attach. to Br. of Appellant. The letter describes a fight between Brockman and Wakefield that lasted at least two days. During this fight, Wakefield denied Brockman all access to his family.
Wakefield was found in Canada, extradited to the United States, and charged with second degree murder. Western State psychiatric hospital found Wakefield paranoid and delusional but competent to stand trial.
The trial court also found her competent after pretrial hearings. During an oral ruling on this issue, the trial court indicated that Wakefield should follow the advice of her attorneys.
A great issue that looms before me this afternoon are certainly her failure to be receptive to a plea offer that would subject her to much less jeopardy than she would if she goes forward with the trial this afternoon.... One of the things Ms. Wakefield said to me just a few moments ago is she is not prepared to plead guilty to anything she did not do.... This is one decision that we can not make for our client, no matter what the cost, we simply can not make that decision and substitute our judgment for them.
. . . . .
I have no doubt in my mind, Ms. Wakefield, that your attorneys are absolutely as capable of guiding you along with this case as any attorneys in this jurisdiction. I can not force you to accept their advise [sic] I can simply urge that you should, but no one can force you to accept their advise [sic].
Report of Proceedings (Dec. 8, 1993) at 25-27 (emphasis added).
Approximately a week later, defense counsel informed the trial court that Wakefield was leaning toward accepting the plea offer but was afraid of being sent to a mental institution. Defense counsel explained that Wakefield probably would plead guilty to first degree manslaughter if she received an assurance from the court that she would be sentenced to a correctional facility. The trial court ceded to defense requests. In addition to explaining to Wakefield that she would be sent to a correctional facility, the trial judge *186 stated that she would sentence Wakefield within the standard sentencing range.
THE COURT: I can tell you this, that if the state is still interested in a plea negotiation, and I am not sure that they are at this point, but if they are interested in going along with the plea to a lesser charge, this court's sentence, this court and two other courts before me have deemed that you are competent to stand trial in this case. This court, if you were to plead guilty and you came back to this court for sentencing, or I think any other court, you would be treated as any other person who pleads guilty to that same charge is treated. You would receive a sentence that is commensurate with your offender score and the seriousness level of the charge that you have pled guilty to. I don't know the range for manslaughter 1 or 2 or whatever it is that the state has offered you, but you would be sentenced, in my opinion, in that standard range by any judge. You would certainly be sentenced within that standard range by this court, and you would be committed to the correctional center for women at Purdy.
Report of Proceedings (Dec. 8, 1993) at 4-5 (emphasis added).
Immediately following the trial court's comments regarding a standard range sentence, Wakefield spoke with her attorneys and accepted the plea arrangement. Both the State and the trial court then engaged in separate colloquies with Wakefield to ensure the voluntariness of her plea and to apprise her of the consequences of pleading guilty including the possibility of a sentence outside the standard range. Wakefield stated for the record that she understood the effect of pleading guilty, including the potential for an exceptional sentence.
A sentencing hearing was held approximately a week after Wakefield pled guilty. With no criminal history and an offender score of zero, the standard sentencing range for Wakefield's first degree manslaughter conviction was 31 to 41 months' confinement. The maximum possible sentence outside the standard range was 10 years. During the sentencing phase of trial, defense counsel requested a 31-month sentence. Pursuant to the plea agreement, the State requested a sentence of 41 months. The trial court, however, imposed an exceptional sentence of 120 months' (10 years') imprisonment because of the victim's vulnerability and Wakefield's abuse of her position of trust. Addressing Wakefield, the trial court stated:
What I do find, and what I think the court cannot overlook, is the fact that you were dealing with an individual who could not resist you in any way, who could not fight back in any way, who could not yell for help, seek help, who couldn't do anything but sit there in that chair and understand, perhaps, for a period of time what you were doing to him.
. . . .
For that reason the court in this case, which I am not sure I have done before, is going to impose the maximum penalty of 120 months in the Department of Corrections. I do that taking into account the fact that you won't serve 120 months, you will serve two-thirds of that....
. . . .
The justification for the exceptional sentence... is the fact that Ms. Wakefield held the position of trust with this individual, she violated that trust. He was particularly vulnerable to the conduct that caused his death, and she deliberately removed any chance or possibility that he had to seek help or to receive help from anyone on the possibility that he was alive when she left him.
Report of Proceedings (Jan. 21, 1994) at 17, 19, 21 (emphasis added). Defense counsel did not object to the exceptional sentence, nor did defense counsel point out that the judge had previously indicated that she would sentence Wakefield within the standard range.
On appeal, Wakefield argues that the trial judge improperly participated in the plea negotiations when she promised to sentence her within the standard range. Wakefield claims that the only appropriate remedy is to remand her case for resentencing within the standard range. Wakefield also contends that the trial court violated the real facts doctrine when it used the word "deliberately" *187 to impose an exceptional sentence. Finally, she maintains that the trial court improperly considered the possibility of good time credits when imposing the 10-year sentence.
In an unpublished opinion, the Court of Appeals held that Wakefield could withdraw her guilty plea since there was the possibility that she had been misled by the trial court's initial assurance of a standard range sentence. The Court of Appeals found no violation of the real facts doctrine. It also upheld the exceptional sentence after determining the trial court would impose the same sentence on remand regardless of the possibility for good time credits. We agree.

TRIAL COURT INVOLVEMENT IN PLEA NEGOTIATIONS
Plea agreements in Washington are governed under RCW 9.94A.080-.100. These statutes provide the prosecutor with authority to amend charges against a defendant, and also permit the prosecutor to recommend a particular sentence as part of a plea arrangement. RCW 9.94A.080 specifically provides that "[t]he court shall not participate in any discussions" regarding plea negotiations. However, the court may reject a plea bargain in "the interests of justice." RCW 9.94A.090(1). The court is not "bound by any recommendations" contained in the plea agreement, and the defendant must be informed of this prior to pleading guilty. RCW 9.94A.090(2).
At all times, the defendant must understand the consequences of pleading guilty. Under Washington's Superior Court Criminal Rules (CrR), the trial court "shall not accept a plea of guilty, without first determining that it is made voluntarily, competently and with an understanding of the nature of the charge and the consequences of the plea." CrR 4.2(d). See also State v. Miller, 110 Wash.2d 528, 531, 756 P.2d 122 (1988) ("A defendant must understand the sentencing consequences for a guilty plea to be valid."). CrR 4.2(f) provides that a trial court must permit the withdrawal of a guilty plea "to correct a manifest injustice." Four nonexclusive criteria exist for determining "manifest injustice":
(1) denial of effective counsel, (2) plea ... not ratified by the defendant or one authorized [by him] to do so, (3) plea was involuntary, (4) plea agreement was not kept by the prosecution.
State v. Saas, 118 Wash.2d 37, 42, 820 P.2d 505 (1991) (quoting State v. Taylor, 83 Wash.2d 594, 597, 521 P.2d 699 (1974)). In the present case, we are concerned primarily with whether the trial court's participation in the plea negotiations affected the voluntariness of Wakefield's plea.
The Court of Appeals in State v. Pouncey, 29 Wash.App. 629, 630 P.2d 932, review denied, 96 Wash.2d 1009 (1981) adopted the American Bar Association's standards for judicial participation in plea negotiations. These standards provide that where the prosecutor and defense are unable to reach a plea agreement, they may ask the trial judge to moderate their discussions. 3 American Bar Ass'n, Standards for Criminal Justice, Std. 14-3.3(c) (2d ed. 1980). Moreover, the trial judge may inquire as to the possibility of a plea arrangement if he or she has not been advised of one. Id. at Std. 14-3.3(e). However, these standards emphasize that "the judge should never through word or demeanor, either directly or indirectly, communicate to the defendant or defense counsel that a plea agreement should be accepted or that a guilty plea should be entered." Pouncey, 29 Wash.App. at 635, 630 P.2d 932 (quoting 3 American Bar Ass'n, supra Std. 14-3.3(f)). Pouncey, in analyzing the American Bar Association standards, concluded that "the appropriate appellate function is to scrutinize the available record carefully to determine whether or not the judge's presence and/or involvement [in the plea negotiations] affected the voluntariness of the defendant's plea." Pouncey, 29 Wash. App. at 637, 630 P.2d 932 (emphasis added). We agree with the reasoning in Pouncey and hold that where a trial court participates in plea negotiations, the critical inquiry is whether such participation resulted in an involuntary plea.
Wakefield claims that the trial court improperly participated in the plea negotiations on three different occasions. First, the trial court expressed concern over Wakefield's *188 "failure to be receptive to a plea offer that would subject her to much less jeopardy." Report of Proceedings (Dec. 8, 1993) at 26. Second, the trial court urged Wakefield to take the advice of her attorneys. "I can not force you to accept their advise [sic]. I can simply urge that you should." Report of Proceedings (Dec. 8, 1993) at 27. Finally, the trial court indicated that it would sentence Wakefield within the standard range if she pleaded guilty. Report of Proceedings (Dec. 14, 1993) at 3-5. Wakefield argues her plea was involuntary as a result of the trial court's impromptu comments.
Wakefield relies on our decision in State v. Miller, 110 Wash.2d 528, 756 P.2d 122 (1988) to argue that she should be granted "specific performance" and sentenced within the standard range. In Miller, the prosecutor inadvertently told the defendant that he could receive a sentence of less than 20 years for a first degree murder conviction. Only after Miller pled guilty did he learn that a statute mandated at least a 20-year sentence. He tried to withdraw his guilty plea, but the trial court denied his motion. Since it was undisputed that Miller did not understand the consequences of pleading guilty, we held that Miller could withdraw his plea or have the plea agreement specifically enforced. Miller, 110 Wash.2d at 536-37, 756 P.2d 122. "[T]he defendant's choice of remedy controls, unless there are compelling reasons not to allow that remedy."[2]Miller, 110 Wash.2d at 535, 756 P.2d 122.
While Wakefield contends she is entitled to specific performance under Miller, that case simply is not analogous. Miller involved prosecutorial breach of a plea agreement. In the present case, the trial court stated that it would sentence Wakefield within the standard range if she accepted a plea agreement. As the Court of Appeals noted,
There is no authority ... for the proposition that the court is bound by any misstatement it may make in explaining the plea and sentencing process. Such a requirement would be particularly unwise in a case such as this where the impropriety of the court's statements was not called to the court's attention.
State v. Wakefield, No. 34154-5-I, slip op. at 8 (Wn.App. May 8, 1995).
Justice Sanders, in his dissent, characterizes a plea agreement as creating a contract between the prosecutor, the defendant, and the trial court. Dissent, at 191. This is wrong. While the State is bound by the plea agreement, the trial court, quite simply, is not. RCW 9.94A.090(2) clearly states that a "sentencing judge is not bound by any recommendations contained in an allowed plea agreement." The prosecutor and the defendant are the only parties to a plea agreement. In contrast, the role of the trial court is carefully circumscribed. Wakefield argues that the trial court's impromptu comments regarding a standard range sentence entitled her to specific performance. Nonetheless, a standard range sentence was not part of the plea agreement and thus cannot be specifically enforced. Even so, Wakefield is not without a remedy. A trial court must permit withdrawal of a plea agreement where the defendant entered the plea involuntarily. CrR 4.2(f).
The State argues that the doctrine of invited error bars Wakefield's claims because each time the trial court became involved in the plea negotiations, it was in response to a request from defense counsel. The doctrine of invited error "prohibits a party from setting up an error at trial and then complaining of it on appeal." State v. Pam, 101 Wash.2d 507, 511, 680 P.2d 762 (1984). See also State v. Boyer, 91 Wash.2d 342, 345, 588 P.2d 1151 (1979) (a defendant cannot propose a jury instruction and then challenge it on appeal). This doctrine is not applicable to the present case. Although defense counsel asked the trial judge to intervene in the plea negotiations, the judge went beyond defense counsel's requests. Defense counsel sought the judge's assurance that Wakefield would be sent to a correctional facility. The judge complied, but then *189 went on to saywithout any prompting from defense counselthat she would sentence Wakefield within the standard range.
There appear to be no reported cases from either this jurisdiction or any other jurisdiction in which a trial judge promised a particular sentence before the defendant accepted a plea bargain, and then reneged on that promise at the time of sentencing. We are mindful of the fact that a trial judge's promise of a standard range sentence could easily sway a defendant to plead guilty. In the present case, the trial judge's involvement in the plea negotiations casts significant doubt on the voluntariness of Wakefield's plea. Given these circumstances, we hold that Wakefield may withdraw her plea and remand to the trial court for a hearing to give Wakefield this opportunity.
Since Wakefield could decline to withdraw her plea, we must determine whether her sentence violated the real facts doctrine or impermissibly took into account the possibility of good time credits. We turn now to those issues.

REAL FACTS DOCTRINE
Under the real facts doctrine, a trial court may not impose a sentence based on the elements of a more serious crime that the State did not charge or prove. RCW 9.94A.370(2); State v. Barnes, 117 Wash.2d 701, 708, 818 P.2d 1088 (1991). In determining the appropriate sentence, the trial court can consider the presentencing reports unless the defendant objects. It can also consider the defendant's admissions at the time of sentencing. RCW 9.94A.370(2).
In the present case, the trial court could only impose an exceptional sentence based on Wakefield's conviction for first degree manslaughter; it could not consider the State's original charge of second degree murder. A conviction for second degree murder requires that the defendant intended to kill the victim. RCW 9A.32.050. A conviction for first degree manslaughter only requires that the defendant recklessly caused the victim's death. RCW 9A.32.060. Recklessness entails "disregard[ing] a substantial risk that a wrongful act may occur ..." RCW 9A.08.010(1)(c).
Wakefield claims that the trial court violated the real facts doctrine when it imposed an exceptional sentence. The trial court sentenced Wakefield outside the standard range because she had violated her position of trust and the victim had been particularly vulnerable. In giving its reasons for the exceptional sentence, the trial court stated that Wakefield "deliberately removed any chance or possibility that [Brockman] had to seek help." Report of Proceedings (Jan. 21, 1994) at 21. Wakefield focuses on the word "deliberately" and argues that the trial court imposed an exceptional sentence based on elements of the more serious crime of intentional murder. Throughout this case, Wakefield has repeatedly denied that she deliberately caused Brockman's death.
We recently held in State v. Chadderton, 119 Wash.2d 390, 832 P.2d 481 (1992) that "when someone recklessly causes the death of a particularly vulnerable person entrusted to his or her care, the factors of abuse of trust and victim vulnerability may properly serve to justify an enhanced sentence for first degree manslaughter." Chadderton, 119 Wash.2d at 392, 832 P.2d 481. Chadderton worked as an aid in a nursing home. One of Chadderton's patients suffered a broken hip after he pushed her into a wheelchair. A series of illnesses resulted from the hip injury, and the patient subsequently died. Chadderton pleaded guilty to first degree manslaughter, and the trial court imposed an exceptional sentence based on the victim's vulnerability and the defendant's abuse of trust. We reversed the exceptional sentence and remanded for further factfinding because it was unclear if the circumstances surrounding the victim's death amounted to an abuse of trust. In particular, it was unclear from the record whether Chadderton forcefully placed the victim into the wheelchair or "brutally hurled her ... from a distance of several feet." Chadderton, 119 Wash.2d at 400, 832 P.2d 481.
Unlike Chadderton, the trial court in the present case had extensive information regarding the events surrounding the death of Robert Brockman, including Wakefield's letter *190 of confession. In her letter, Wakefield states that she deliberately denied Brockman all access to his family, and deliberately cut off all lines of communication that Brockman had to the outside world. These deliberate acts went hand in hand with Wakefield's reckless behavior, and it makes sense that the trial court would take them into account. There is no indication, however, that the trial court considered the elements of second degree murder, instead of first degree manslaughter, when it sentenced Wakefield. Thus, we find no violation of the real facts doctrine.

GOOD TIME CREDITS
The trial court imposed the maximum penalty of 120 months (10 years) "taking into account the fact that you won't serve 120 months, you will serve two-thirds of that." Report of Proceedings (Jan. 21, 1994) at 19. This was an oral statement and was not included in the trial court's written findings of facts and conclusions of law justifying the exceptional sentence.
This court has held that a trial court may not rely on the possibility of early release for good time credits when imposing an exceptional sentence.
The framework of the SRA [Sentencing Reform Act of 1981] indicates that earned early release time is to be considered only after the offender has begun serving his sentence. See RCW 9.94A.150(1). Moreover, it would be inappropriate to impose a sentence outside the presumptive range based on an entirely speculative prediction of the likely behavior of an offender while in confinement.
State v. Fisher, 108 Wash.2d 419, 429 n. 6, 739 P.2d 683 (1987). See also State v. Buckner, 74 Wash.App. 889, 899, 876 P.2d 910 (1994), rev'd, 125 Wash.2d 915, 890 P.2d 460 (1995); State v. Ross, 71 Wash.App. 556, 861 P.2d 473, amended by, 883 P.2d 329 (1994), review denied, 123 Wash.2d 1019, 875 P.2d 636 (1994). However, a trial court's reliance on the availability of good time credits when imposing an exceptional sentence does not automatically result in a reversal of the sentence. If overwhelming aggravating factors exist to justify an exceptional sentence, the sentence will be upheld even if the trial court improperly relied on the possibility of good time credits. Fisher, 108 Wash.2d at 429-30, 739 P.2d 683; Ross, 71 Wash.App. at 575, 861 P.2d 473.
In the present case, the trial court merely commented at the sentencing hearing that Wakefield likely would serve less time, but did not justify the exceptional sentence on this basis. The trial court imposed the exceptional sentence relying solely on the aggravating factors of abuse of trust and victim vulnerability. Moreover, even if the trial court initially considered the possibility for early release when imposing the exceptional sentence, it would in all probability impose the same sentence on remand given the circumstances of this case. Thus, resentencing is unnecessary.
GUY, DOLLIVER, SMITH, JOHNSON and TALMADGE, JJ., concur.
ALEXANDER, Justice (concurring in part, dissenting in part).
I dissent, in part, but for reasons that differ from those advanced by Justice Sanders in his concurrence/dissent. The thrust of that opinion is that the defendant, Wakefield, is entitled to the benefit of what she asserts was her bargain with the trial court and that specific performance is the remedy to enforce that bargain. While I recognize that specific performance is available as a remedy to a defendant in the event of a breach of a plea agreement by the prosecutor, I am not persuaded that contract principles should be applied in an instance where a trial court judge has not fulfilled a promise made to a defendant at the time a plea of guilty is entered. The trial court, unlike the prosecuting attorney and defense counsel, is to retain its neutrality in all criminal proceedings and is not to bargain with the parties that appear before it. That is consistent with general principles of jurisprudence, as well as RCW 9.94A.090(2), a statute that provides that the "sentencing judge is not bound by any recommendations contained in an allowed plea agreement." In short, contract principles do not fit the case at hand.
*191 On the other hand, the record in this unusual case shows that the sentencing judge made statements to Wakefield which induced her to plead guilty to the charge of first degree manslaughter. To not enforce the promise made by the judge would, in my judgment, violate the defendant's due process rights, notwithstanding the explicit terms of RCW 9.94A.090(2). "[W]here fundamental principles of due process so dictate, the specific terms of a plea agreement ... may be enforced despite the explicit terms of a statute." State v. Miller, 110 Wash.2d 528, 532, 756 P.2d 122 (1988). "If a defendant cannot rely upon an agreement made and accepted in open court, the fairness of the entire criminal justice system would be thrown into question." State v. Tourtellotte, 88 Wash.2d 579, 584, 564 P.2d 799 (1977).
While an argument might well be made that the due process violation could be cured by ordering resentencing before another judge, I believe that such a remedy would not be adequate in this case. In that regard, I agree with Justice Sanders that "integrity of the judicial process" is at stake in this case. Concurrence/Dissent at 193. To insure that its integrity remains unimpeached, the defendant should receive the sentence promised by the trial court judge.
MADSEN, J., concurs.
SANDERS, Justice (concurring in part, dissenting in part).
I concur in the result reached by the majority that the plea agreement between defendant Wakefield, the prosecutor, and the judge was broken; however, I dissent insofar as the majority holds that specific performance is not an available remedy. I would grant Wakefield the option to choose specific performance of the trial court's promise that she would be sentenced within the standard range.
The majority holds that specific performance is not an available remedy because the trial judge rather than the prosecutor made and broke the plea-inducing promise. All reason dictates that the same remedies be available to a defendant facing a broken plea agreement whether the plea-inducing promise was made and broken by the prosecutor or the judge.
Plea agreements are regarded and interpreted as contracts. Construing plea agreements as contracts originates with the seminal Supreme Court case of Santobello v. New York, 404 U.S. 257, 262, 92 S.Ct. 495, 498, 30 L.Ed.2d 427 (1971). This court held in Wheeler that courts should "strictly apply[] contract principles [to plea agreements]." State v. Wheeler, 95 Wash.2d 799, 803, 631 P.2d 376 (1981). State v. Hardesty, 129 Wash.2d 303, 318, 915 P.2d 1080 (1996) ("A plea bargain is essentially contractual.") (citing Santobello, 404 U.S. 257, 92 S.Ct. 495, 30 L.Ed.2d 427). See also United States v. Read, 778 F.2d 1437, 1441 (9th Cir.1985) ("Although the plea bargain is a matter of criminal jurisprudence, a plea bargain is contractual in nature and is measured by contract-law standards."), cert. denied, 479 U.S. 835, 107 S.Ct. 131, 93 L.Ed.2d 75 (1986).
Under a contract theory, each party to the plea agreement gives consideration, thereby rendering the agreement enforceable. See Wayne R. LaFave & Jerold H. Israel, Criminal Procedure § 21.1(a) (2d ed. 1992). The defendant gives as consideration his constitutional rights to: jury trial; confront witnesses; confront one's accusers; remain silent; and be convicted beyond all reasonable doubt. State v. Tourtellotte, 88 Wash.2d 579, 583, 564 P.2d 799 (1977). This waiver of rights is "perhaps the most devastating waiver possible under our Constitution." Dukes v. Warden, Conn. State Prison, 406 U.S. 250, 258, 92 S.Ct. 1551, 1555, 32 L.Ed.2d 45 (1972) (Stewart, J., concurring). Because of the fundamental importance of what the defendant gives up as consideration in a plea agreement, our courts are serious about providing an adequate remedy when the State breaches. In re James, 96 Wash.2d 847, 849-50, 640 P.2d 18 (1982).
The terms of a plea agreement are defined by what the defendant reasonably understood them to be when she entered her plea. State v. Cosner, 85 Wash.2d 45, 51-52, 530 P.2d 317 (1975). See also United States v. Quan, 789 F.2d 711, 713 (9th Cir.) (the reviewing court looks to what the defendant reasonably understood when she entered the *192 plea to determine whether a plea agreement has been broken), cert. dismissed, 478 U.S. 1033, 107 S.Ct. 16, 92 L.Ed.2d 770 (1986).
Here it was manifestly reasonable for defendant Wakefield to believe that her plea agreement included a promise by the judge of a standard range sentence. All parties involved knew that Wakefield had been repeatedly offered a plea and had repeatedly declined to accept. In open court her attorney told the judge that Wakefield was considering making a plea and asked what assurances the judge could give. While the judge had on several prior occasions interjected remarks, she fully entered by responding "if you were to plead guilty ... [y]ou would certainly be sentenced within that standard range by this court." Report of Proceedings (Dec. 8, 1993) at 5. Immediately thereafter, Wakefield waived her constitutional right to trial and pleaded guilty.
While in general a judge refrains from active participation in plea agreements, this judge was clearly a participant here. She made the promise which finally induced the plea.[1] The majority implicitly agrees with this. Indeed, if the judge's sentencing of Wakefield outside the standard range did not violate the terms of the agreement as understood by Wakefield, then she would have no case and no cause for relief. By granting her relief, the majority acknowledges that her plea agreement was breached.
The cardinal rule in the enforcement of plea agreements, like contracts, is "`[t]he defendant is entitled to the benefit of his original bargain.'" State v. Schaupp, 111 Wash.2d 34, 41, 757 P.2d 970 (1988) (quoting Tourtellotte, 88 Wash.2d at 585, 564 P.2d 799). Because money damages are inappropriate, specific performance is the remedy which best gives the defendant the benefit of her bargain. Rescission of the agreement (withdrawal) is also an available remedy. See Schaupp, 111 Wash.2d at 41, 757 P.2d 970 ("Two remedies are available for breach of a plea bargainwithdrawal of the plea and specific performance."). See also In re James, 96 Wash.2d 847, 849-50, 640 P.2d 18 (1982) (When the State breaches a plea agreement, "a defendant is entitled to withdraw any entered plea or to have the bargain specifically enforced."). See also Tourtellotte, 88 Wash.2d at 585, 564 P.2d 799 (specific performance is the adequate remedy when the State breaches a plea agreement).
When the State breaches a plea agreement, the defendant is given broad latitude to choose her remedy. For example, in State v. Miller, the State urged that the defendant not be entitled to choose between specific performance and withdrawal but rather be forced to accept specific performance of the agreement. State v. Miller, 110 Wash.2d 528, 756 P.2d 122 (1988). The court disagreed and granted the defendant's chosen remedy of withdrawal, stating, "We hold now that the defendant's choice of remedy controls...." Id. at 535, 756 P.2d 122. In State v. Schaupp, 111 Wash.2d 34, 757 P.2d 970 (1988), the State argued the reverse, i.e., that withdrawal was the only available remedy, while the defendant asserted he had the option to choose between withdrawal and specific performance. Id. at 41, 757 P.2d 970. This court again held that both remedies are available and "[t]he defendant's choice of remedy controls...." Id.
The only issue then is whether this rule should apply when the judge rather than the prosecutor makes and breaks a plea-inducing promise.
The majority opinion acknowledges the trial court may be ordered to specifically perform the plea bargain between the prosecution and the defense when approved by the court, but asserts that specific performance should not be ordered when the trial judge herself participates in the bargain and then approves it.
I find this distinction untenable in the light of precedent which enforces the prosecution's promise in a plea bargain agreement exactly because that agreement was approved by the *193 court. If the court can be held to specifically perform prosecution promises based upon its approval, then surely the court may be directed to specifically perform its own. Cf., e.g., Tourtellotte, 88 Wash.2d at 584, 564 P.2d 799 ("An agreement between the parties which is approved by the trial judge cannot be turned aside simply because of the exigencies of the moment."); In re Palodichuk, 22 Wash.App. 107, 113, 589 P.2d 269 (1978) ("In our view petitioner should be given the choice of either withdrawing his plea and pleading anew, or of being resentenced on his original plea consistent with the plea bargain agreement."); State v. Schaupp, 111 Wash.2d 34, 38, 757 P.2d 970 (1988) ("Those principles operate to bind the court, as well, once a plea agreement has been validly accepted."); State v. Miller, 110 Wash.2d 528, 532-36, 756 P.2d 122 (1988) (trial court ordered to specifically comply with plea agreement which it approved even if resulting sentence is contrary to statute, despite concurring opinion by Durham, J., which states: "To my mind, this is an impossible result." 110 Wash.2d at 538, 756 P.2d 122.).
In light of RCW 9.94A.090(2) ("sentencing judge is not bound by any recommendations contained in an allowed plea agreement...."), Justice Alexander's separate dissenting opinion states that the trial court must be held to its plea-inducing representation as a requirement of due process rather than contract. This view finds support in Miller, 110 Wash.2d at 532, 756 P.2d 122, which relies upon "fundamental principles of due process" to sustain the rule that the defendant "must be given the initial choice of a remedy to specifically enforce the agreement or withdraw the plea." Id. at 536, 756 P.2d 122. Clearly there is a great deal of overlap between principles of contract and due process in this context. Both rely upon the fundamental fairness of requiring the court to make good on its promise, but from slightly different doctrinal perspectives.
All the rationales for awarding specific performance should apply in this case regardless of whether the judge or the prosecutor makes and breaks the deal and regardless of whether we base this conclusion on contract or due process. Through application of, or analogy to, contract law, specific performance is a necessary remedy when money damages is insufficient. In Tourtellotte, after the State breached, the State sought withdrawal of the plea while the defendant requested specific performance of the bargain. Tourtellotte, 88 Wash.2d at 585, 564 P.2d 799. The court noted that allowing withdrawal of the plea as the sole remedy would be unfair to the defendant. "To place the defendant in a position in which he must again bargain with the state is unquestionably to his disadvantage. The security he had gained as a result of the plea negotiation from being charged with the more grievous offense would be lost. The defendant is entitled to the benefit of his original bargain." (Citations omitted.) Tourtellotte, 88 Wash.2d at 585, 564 P.2d 799. It seems inconsistent to conclude we may order the trial court to specifically sentence in accordance with the prosecutor's promise but not to do so in accordance with the judge's.
"[T]he state [is held] to a particularly high duty of care when it makes promises to defendants in criminal cases." Peter Westen & David Westin, A Constitutional Law of Remedies for Broken Plea Bargains, 66 Cal. L.Rev. 471, 524 (1978). Such care is needed because of the constitutional rights at stake when a defendant pleads guilty and forgoes trial by jury. As this court stated, "When the prosecutor breaks the plea bargain, he undercuts the basis for the waiver of constitutional rights implicit in the plea." Tourtellotte, 88 Wash.2d at 584, 564 P.2d 799. If the judge makes and breaks an agreement, a defendant's rights are equally undercut, if not more so.
The majority's ruling calls into question the integrity of the judicial process. We have reiterated that "`[i]f we do not [specifically] enforce the agreement, the state would be permitted to play fast and loose with an accused's constitutional rights to its advantage and his detriment.'" (Citation omitted.) Tourtellotte, 88 Wash.2d at 585, 564 P.2d 799. "If a defendant cannot rely upon an agreement made and accepted in open court, the fairness of the entire criminal justice system would be thrown into question." Id. at 584, 564 P.2d 799. This proposition is equally *194 true when the agreement is made with the judge as with the prosecutor. In fact, as the neutral hand of justice, the judge should be held to an even higher standard than the prosecutor. However, the majority here creates a judicial exemption allowing a judge to renege on a promise made in open court while the same act by a prosecutor would certainly result in specific performance. There is no valid justification for this distinction. Accordingly, I dissent.
NOTES
[1] There was also some evidence that Brockman was denied sustenance in the days before his death. However, Wakefield repeatedly disputed this allegation, and the state agreed not pursue this as a cause of death.
[2] Miller permits specific performance of a plea agreement that violates the clear mandate of the sentencing statute. Admittedly, this proposition has been a point of controversy among members of this court. See State v. Miller, 110 Wash.2d 528, 538-39, 756 P.2d 122 (1988) (Durham, J., concurring in the result).
[1] Participation by a judge in plea negotiations, while disfavored and rare, is not unheard of. A recent article on plea bargaining notes: "Less frequently, a plea agreement can be reached among the prosecutor, defense attorney and the judge, in which the judge agrees to give a certain sentence for a specific guilty plea." Ursula Odiaga, The Ethics of Judicial Discretion in Plea Bargaining, 2 Geo.J.Legal Ethics 695, 696 (1989).