FILED
COURT OF APPEALS
DIVISION II

2015 APR 28 AM 8: 35

STATE OF WASHINGTON
BY
DEPUTY

# IN THE COURT OF APPEALS OF THE STATE OF WASHINGTON

## DIVISION II

| | |
|---|---|
| In the Matter of the Personal Restraint of:<br><br>TOMMY LEE CROW, JR.,<br><br><br>Petitioner | No. 42926-8-II<br><br><br><br>PART PUBLISHED OPINION |

WORSWICK, P.J. — In this personal restraint petition (PRP), Tommy Crow petitions us to vacate his two second degree murder convictions and, alternatively, to modify his aggravated sentence. Crow raises numerous arguments, claiming: (1) sentencing errors, (2) prosecutorial misconduct, (3) ineffective assistance of counsel, and (4) erroneous jury instructions. In the published portion of this opinion, we hold that the evidence was insufficient to support the good Samaritan aggravator and that the trial court erred by explicitly considering good time credits when sentencing Crow. In the unpublished portion of this opinion, we reject the remainder of Crow's arguments. Accordingly, we grant Crow's petition in part by vacating his sentence on both counts and remanding for resentencing. We deny the remainder of Crow's petition.

## FACTS

On March 28, 2008, at a homeless campsite in Olympia, Washington, Tommy Crow, Bryan Eke, and Christopher Durga, murdered David Miller and Norman Peterson. On March 18, Miller had reported to law enforcement that he witnessed Eke and Durga assault Scott Cover on March 7. On March 27, Durga learned law enforcement had information inculpating him in Cover's assault.

On March 28, the night of Miller's murder, Crow, Eke, and Durga went to Miller's campsite. Crow struck Miller in the face, and Durga put Miller in a choke hold until he was incapacitated. Durga then dragged Miller's body into the campsite fire and stood on his back.

When Peterson arrived at Miller's camp and saw Miller's body in the fire, Crow struck Peterson in the head with a tree branch and put him in a choke hold until he was incapacitated. Crow then threw Peterson's body into the campsite fire with Miller's. A medical examiner later determined that Miller and Peterson died by strangulation.

The State charged Crow with two counts of second degree murder, each with a separate sentencing aggravator: a good Samaritan sentencing aggravator[1] for murdering Miller in retaliation for reporting Cover's assault to law enforcement, and a deliberate cruelty sentencing aggravator[2] for Peterson's murder. Each murder count included the alternative means of intentional murder and felony murder (with second degree assault as the predicate felony). The State charged Crow as both an accomplice and principal. The State also charged Crow with second degree arson.

A jury found Crow guilty as charged. On the special verdict forms, the jury answered "yes" to both sentencing aggravators.

At sentencing, the State recommended an exceptional sentence of 300 months imprisonment for each second degree murder charge, to be served consecutively, for a combined total of 600 months imprisonment. The trial court asked the State, "[W]hat credit for good time in the future will [Crow] be eligible to receive that would subtract from the sentence that you've

---

[1] RCW 9.94A.535(3)(w).

[2] RCW 9.94A.535(3)(a).

2

recommended here?" Verbatim Report of Proceedings (VRP) (Sentencing) at 1451. The State

responded, "On [the two murder charges] [Crow] would receive a maximum of ten percent only

for good time." VRP (Sentencing) at 1451.

Crow's counsel made no sentencing argument on Crow's behalf, instead stating, "Your

honor, I don't really have much to say. I think we lost any chance of influencing this court's

decision with respect to sentencing when this case went to trial." VRP (Sentencing) at 1476.

Trial counsel stated a total of three times that he had lost any chance of influencing the trial

court's sentencing decision after the case went to trial.

For Miller's murder, the trial court imposed a 360-month exceptional sentence based on

the good Samaritan aggravating factor. For Peterson's murder, the trial court imposed a 300-

month exceptional sentence, based on the deliberate cruelty aggravating factor. Because these

were serious violent offenses, the trial court ordered these two sentences to be served

consecutively,[3] resulting in a total sentence of 660 months imprisonment.[4]

Regarding Crow's sentence, the trial court said:

> I've gone above the amount requested by the prosecutor or suggested by the prosecutor as appropriate in this case, and I've differentiated between the amount of time imposed for [the two murder counts].
>
> . . . .
>
> The reason that I've differentiated between the two sentences is . . . [Millers' act of reporting the assault to law enforcement] was an act of extraordinary bravery, in my estimation, and the exceptional sentence that I've imposed here reflects that determination.

---

[3] RCW 9.94A.589(1)(b); *see* former RCW 9.94A.030(41)(a)(iii)(2006).

[4] The trial court also sentenced Crow to 43 months imprisonment for the arson, to be served concurrently with the two murder sentences.

No. 42926-8-II

VRP (Sentencing) at 1482-84. The trial court also reiterated that it considered good time credits in determining Crow's sentence:

> With the imposition of this sentence, Mr. Crow, you will serve, even with a good time credit, a full 50 years of incarceration.

VRP (Sentencing) at 1483.

> In its written order, the trial court ruled:

> The [two aggravating factors] listed in the preceding paragraph, taken together or considered individually, constitute sufficient cause to impose the total of 660 months for the exceptional consecutive sentences for [Crow's two murder convictions]. This court would impose the same total exceptional penalty for those consecutive sentences if only one of the grounds listed in the preceding paragraph is valid.

Clerk's Papers (CP) at 100.

We affirmed Crow's convictions on direct appeal in an unpublished opinion. On direct appeal, appellate counsel did not challenge the consideration of good time credits, the good Samaritan aggravator, or any sentencing issue. Crow then filed this PRP.

ANALYSIS

A PRP is not a substitute for a direct appeal. *In re Pers. Restraint of Hagler*, 97 Wn.2d 818, 824, 650 P.2d 1103 (1982). We are reluctant to overturn a settled judicial decision where the petitioner has already had an opportunity for appeal. *In re Pers. Restraint of Cross*, 180 Wn.2d 664, 676, 327 P.3d 660 (2014). Accordingly, there are limits on the use of a PRP to collaterally attack a criminal offender's restraint. *Hagler*, 97 Wn.2d at 824.

A personal restraint petition must state with particularity the factual allegations which, if proven, would entitle the petitioner to relief. *In re Pers. Restraint of Rice*, 118 Wn.2d 876, 886, 828 P.2d 1086 (1992). Further, the factual allegations must have evidentiary support. 118

4

Wn.2d at 886. If the record does not support the factual allegations, then the petitioner must show through affidavits or other forms of corroboration that competent and admissible evidence will establish the factual allegations. 118 Wn.2d at 886.

Once the petitioner states in his petition the facts underlying the claim of unlawful restraint and the evidence supporting these allegations, we then examine the State's response. 118 Wn.2d at 886. "The State's response must answer the allegations of the petition and identify all material disputed questions of fact." 118 Wn.2d at 886. If answering the petitioner's allegation requires reference to another proceeding's record, the State must include a copy of that record's relevant parts. RAP 1.2(b); 16.9(a); *see In re Pers. Restraint of Reise*, 146 Wn. App. 772, 780, 192 P.3d 949 (2008).

To be entitled to collateral relief through a PRP the petitioner must prove error "by a preponderance of the evidence." *In re Pers. Restraint of Monschke*, 160 Wn. App. 479, 490, 251 P.3d 884 (2010). If the petitioner is able to show error, he is also required to prove prejudice, the degree of which depends on the type of error shown. To be entitled to relief for a constitutional error, the petitioner must also prove by a preponderance of the evidence that the error caused actual and substantial prejudice. *Cross*, 180 Wn.2d at 676. Actual and substantial prejudice, which "must be determined in light of the totality of circumstances," exists if the error "so infected petitioner's entire trial that the resulting conviction violates due process." *In re Pers. Restraint of Music*, 104 Wn.2d 189, 191, 704 P.2d 144 (1985). To be entitled to relief for a nonconstitutional error, the petitioner must prove by a preponderance of the evidence that the error caused a fundamental defect resulting in a complete miscarriage of justice. *Cross*, 180 Wn.2d at 676; *Monschke*, 160 Wn. App. at 490-91.

I. INSUFFICIENT EVIDENCE SUPPORTS MILLER'S GOOD SAMARITAN STATUS

Crow first argues that the evidence is insufficient to support the good Samaritan aggravator on Miller's murder. Crow argues Miller's act of reporting the assault of Cover to law enforcement a week after the assault occurred, and two weeks before Miller was murdered, did not make Miller a "good Samaritan" because Miller was not harmed while providing immediate aid to someone in peril. Supp. Br. of Pet'r at 9. The State argues that even if we determine the evidence was insufficient, Crow failed to show actual and substantial prejudice because the trial court explicitly stated the total sentence for both murders would be the same with only one of the two sentencing aggravators. We agree with Crow.

A defendant's assertion of insufficient evidence asserts a constitutional error. *State v. Arquette*, 178 Wn. App. 273, 281, 314 P.3d 426 (2013). Thus, Crow must demonstrate actual and substantial prejudice to prevail. *Cross*, 180 Wn.2d at 676.

Substantial evidence must support a sentencing aggravator that allows the trial court to impose an exceptional sentence. *See State v. Gordon*, 172 Wn.2d 671, 680-81, 260 P.3d 884 (2011); *In re Pers. Restraint of Howerton*, 109 Wn. App. 494, 502, 36 P.3d 565 (2001). We review claims of insufficient evidence to determine "whether, after viewing the evidence in the light most favorable to the State, any rational trier of fact could have found guilt beyond a reasonable doubt." *State v. Salinas*, 119 Wn.2d 192, 201, 829 P.2d 1068 (1992).

We review questions of statutory interpretation de novo, interpreting statutes to give effect to the legislature's intent. *State v. Bunker*, 169 Wn.2d 571, 577-78, 238 P.3d 487 (2010). When construing a statute, we first examine the statute's plain meaning. 169 Wn.2d at 578. We determine a statute's plain meaning from the ordinary meaning of its language, as well as from

the statute's general context, related provisions, and the statutory scheme as a whole. *State v. Jacobs*, 154 Wn.2d 596, 600, 115 P.3d 281 (2005).

Where the meaning of statutory language is plain on its face, we give effect to that plain meaning as an expression of legislative intent. *See State v. Jones*, 172 Wn.2d 236, 242, 257 P.3d 616 (2011). But if after conducting a plain meaning review, the statute is still susceptible to more than one interpretation, then we may rely on statutory construction, legislative history, and relevant case law to determine legislative intent. 172 Wn.2d at 242.

Under RCW 9.94A.535(w), the trial court may exceed the standard sentencing range where "the defendant committed the offense against a victim who was acting as a good Samaritan."[5] No definition of "good Samaritan" appears in the statute. RCW 9.94A.535(w). Nothing from the statute's general context, related provisions, or the statutory scheme as a whole provides insight into whether the legislature intended to limit the term "good Samaritan" to those harmed while providing immediate aid to another, or intended to expand the term's meaning to include any victim whose good deed directly caused his victimization. Thus, RCW 9.94A.535(w)'s term "good Samaritan" is susceptible to more than one interpretation and we rely on statutory construction, legislative history, and relevant case law to determine legislative intent.

When passing RCW 9.94A.535(w), the legislature intended to codify the common law good Samaritan sentencing aggravator. *State v. Siers*, 158 Wn. App. 686, 690, 244 P.3d 15 (2010) *overruled on other grounds by* 174 Wn.2d 269 (2012); LAWS OF 2005, ch. 68, §§ 1, 3.

---

[5] While we recognize that RCW 9.94A.535(w) does not capitalize "Samaritan" we choose do so in this opinion for consistency.

7

(the bill that codified the good Samaritan sentencing aggravator and stated: "[t]he legislature intends . . . to codify existing common law aggravating factors, without expanding or restricting existing statutory or common law aggravating circumstances"); *see also* 11A WASHINGTON PRACTICE: WASHINGTON PATTERN JURY INSTRUCTIONS: CRIMINAL 300.32 (3d Ed 2008). In *State v. Hillman*, Division One of this court stated that the common law good Samaritan aggravator was supported by the legislature's concern with protecting bystanders so as "to prevent an innocent person from being injured without the assistance of bystanders," because "to murder a person *who comes to one's aid* discourages others from *offering aid* to persons in need of help." 66 Wn. App. 770, 776, 832 P.2d 1369 (1992) (emphasis added).

Civil cases have also addressed the definition of "good Samaritan." In *Butzberger v. Foster*, the lead opinion noted that "[t]he law has long recognized that seeing a person injured or in peril compels those called to follow the example of the Good Samaritan to provide *assistance*." 151 Wn.2d 396, 412, 89 P.3d 689 (2004) (lead opinion) (emphasis added). In *Gardner v. Loomis Armored Inc.*, our Supreme Court stated that a person became a good Samaritan "by voluntarily risking his own life and *aiding* a helpless victim of crime."[6] 128 Wn.2d 931, 946, 913 P.2d 377 (1996) (emphasis added).

---

[6] The State cites *State v. Hooper* for the argument that reporting crimes to the police is included in the definition of "good Samaritan." 100 Wn. App. 179, 185, 997 P.2d 936 (2000). But *Hooper* is distinguishable from this case for two reasons. First, the *Hooper* court recognized that under the law as it stood at the time, the statutory list of aggravating factors was "illustrative only," and the defendant's conduct did not need to "precisely fit within one of the factors." 100 Wn. App. at 185. But this was no longer the law after the legislature amended the statute in 2005. *Compare* former RCW 9.94A.535 (2003) *with* former RCW 9.94A.535(3) (2005). Second, the victim in *Hooper* was a bystander who was calling 911 to report a crime as it was occurring, whereas the victim in this case reported a crime a week after its occurrence. 100 Wn. App. at 181-82.

We hold the legislature intended RCW 9.94A.535(w)'s term "good Samaritan" to refer to *bystanders* who are harmed while providing immediate aid to someone in peril. Because Miller reported the assault of Cover to law enforcement over a week after Cover was assaulted and over two weeks before Miller was murdered, Miller was not harmed while providing immediate aid to someone in peril. *See Hillman*, 66 Wn. App. at 776. Thus, we hold that insufficient evidence supports the good Samaritan aggravator because Miller's act of reporting Cover's assault to the police over a week after it occurred, while admirable, did not make Miller a good Samaritan under RCW 9.94A.535(w). Thus, Crow has proven error.

Crow has also proven that this error caused him actual and substantial prejudice. Here, the good Samaritan aggravator applied only to Miller's murder. Thus, without the good Samaritan aggravator, the trial court could not have imposed an exceptional sentence above the standard range for Miller's murder. Assuming without deciding that the trial court would have increased the exceptional sentence for Peterson's murder to compensate for its inability to impose an exceptional sentence for Miller's murder, this would not have removed the actual and substantial prejudice Crow suffered by the increased sentence for Miller's murder. Thus, Crow has shown actual and substantial prejudice as to Miller's murder.[7]

---

[7] The State argues that Miller is a good Samaritan because by reporting Cover's assault to law enforcement, he helped the local homeless community. The State's argument fails because we hold the term good Samaritan refers to those harmed while providing *immediate* aid to someone in peril, and reporting a crime to help the community is not providing immediate aid to someone in peril. We also note that accepting the State's argument would strain the limits of due process by extending the good Samaritan aggravator to a defendant who victimized anyone doing anything that arguably provided a benefit to society.

## II. Erroneous Consideration of Good Time Credits

Crow next argues that the trial court erred by explicitly considering good time credits when determining his sentence on both murders. Again, we agree.

By arguing that the trial court's sentence exceeded its statutory authority under the Sentencing Reform Act of 1981[8] (SRA), Crow asserts a nonconstitutional error. *See In re Pers. Restraint of Goodwin*, 146 Wn.2d 861, 867-68, 50 P.3d 618 (2002). Thus, to be entitled to relief, Crow must prove by a preponderance of the evidence that the error caused a fundamental defect resulting in a complete miscarriage of justice. *Cross*, 180 Wn.2d at 676; *Monschke*, 160 Wn. App. at 490-91. A sentence in excess of the trial court's statutory authority under the SRA constitutes a fundamental defect resulting in a complete miscarriage of justice. *In re Pers. Restraint of West*, 154 Wn.2d 204, 213, 110 P.3d 1122 (2005); *Goodwin*, 146 Wn.2d at 867-68.

Under the SRA, the trial court may not consider a defendant's potential good time credits when imposing an exceptional sentence.[9] *State v. Wakefield*, 130 Wn.2d 464, 477-78, 925 P.2d 183 (1996). Here, it is clear that the trial court improperly considered Crow's potential credits.

---

[8] Chapter 9.94A RCW.

[9] The State asks us to hold that while considering good time credits in determining *whether* to impose an exceptional sentence is impermissible, considering good time credits in determining an exceptional sentence's *length* is permissible. But the case law does not support this distinction. "The framework of the SRA [Sentencing Reform Act of 1981] indicates that earned early release time is to be considered only after the offender has begun serving his sentence. Moreover, it would be inappropriate to impose a sentence outside the presumptive range based on an entirely speculative prediction of the likely behavior of an offender while in confinement." *See State v. Wakefield*, 130 Wn.2d 464, 478, 925 P.2d 183 (1996) (alteration in original) (citation omitted) (quoting *State v. Fisher*, 108 Wn.2d 419, 429 n.6, 739 P.2d 683 (1987)).

The trial court asked the State, "[W]hat credit for good time in the future will [Crow] be eligible to receive that would *subtract* from the sentence that you've recommended here?" VRP (Sentencing) at 1451 (emphasis added). The State said that good time credits could reduce Crow's sentence for the two murders by a maximum of 10 percent. VRP (Sentencing) at 1451. Following this exchange, the trial court sentenced Crow to a sentence that was 10 percent greater than the State's recommendation, stating, "With the imposition of this sentence, Mr. Crow, you will serve, even with a good time credit, a full 50 years of incarceration." VRP (Sentencing) at 1483. Thus, because Crow has shown that the trial court exceeded its authority under the SRA by considering future good time credits when sentencing him, Crow has shown a fundamental defect resulting in a complete miscarriage of justice. *West*, 154 Wn.2d at 213; *Goodwin*, 146 Wn.2d at 867-68.

Because the evidence was insufficient to support the good Samaritan aggravator and the trial court erred by explicitly considering good time credits when sentencing Crow, we grant Crow's petition in part by vacating his sentence on both counts and remanding for resentencing.

A majority of the panel having determined that only the foregoing portion of this opinion will be printed in the Washington Appellate Reports and that the remainder shall be filed for public record in accordance with RCW 2.06.040, it is so ordered.

ADDITIONAL FACTS

A.     *Facts Related to Crow's Prosecutorial Misconduct Claims*

1. *Alleged Threats To Coerce Durga To Provide Perjured Testimony*

The State called Durga to testify at trial against Crow, pursuant to a plea agreement. Over two years after Crow's conviction, Durga filed a sworn declaration stating the prosecutor

11

had threatened him with jail time to compel Durga to falsely testify that Crow was involved in Miller's assault. The prosecutor in this case submitted a sworn declaration stating he never threatened Durga and that he instructed Durga only to tell the truth.

We remanded Crow's petition for a reference hearing to determine whether the prosecutor threatened Durga in order to compel him to provide false testimony implicating Crow in Miller's murder. After the reference hearing, the trial court found that "[t]he prosecutor did not threaten Durga . . . with additional prison time if Durga did not testify that Crow was involved in the assault or murder of Miller." Findings of Fact Following Reference Hearing, *In Re Personal Restraint of Crow*, No. 08-1-00585-6, at 2 (Thurston County Super. Ct. Wash. Jun. 12, 2014). Crow does not challenge this finding.

2. *Alleged Statements of Personal Opinion in the State's Closing Argument*

At trial, the State presented testimony from Durga and Eke, both of whom testified pursuant to plea agreements with the State. The State elicited testimony from Eke admitting that prior to his plea deal with the State, he had lied multiple times to authorities regarding events relevant to this case. The State's questions challenged both Eke and Durga for making statements in their testimony that were inconsistent with their prior statements to authorities.

Durga testified that Crow referred to him as his "little brother" and that Crow was present with Durga when they assaulted Miller. 7 VRP at 1125. Durga also testified that Crow attempted to hit Durga but missed, at which point Durga put Miller in a chokehold. The State impeached Durga's testimony, showing that in his prior statements to authorities Durga had said that Crow actually hit Miller.

The State then challenged Durga and Eke's honesty in its closing argument:

Durga is a witness who is quite capable of implanting these little bits of fantasy. And I submit that you see evidence of that in a number of aspects of his story about the events or what happened on the evening [of the murders]. . . .

The State believes that it's important for all of you to use caution with regard to the testimony of [Durga or Eke]. Neither one of these individuals, unfortunately, came up to this witness stand to simply tell the truth. And the State submits that that was pretty apparent. . . .

Each one of them had a different kind of motive, if you will. For Mr. Eke it's himself. For Mr. Durga, what came through loud and clear was perhaps a little bit for himself, but mostly for his brother [Crow]. . . .

[Y]ou know, [Durga and Eke] had something in mind here, and it's not the truth. And if the truth gets in the way of what it is that is of concern to them, then the truth is going to have to go away. And we see that over and over again, the State submits, in their testimony, in both of their testimony, not just in one.

But at the same time, by considering their testimony in the light of all the other evidence you have, it is possible to glean the truth out of all of this.

. . . .

And when you hear Mr. Durga's testimony, you hear a constant theme of protecting my brother. On the other hand, you know, that doesn't mean that we can necessarily trust Mr. Eke's testimony, because we're hearing the constant theme of him of protecting himself. But that breakdown is repeated over and over again, you know, in the testimony of both of them. And that's just an example.

. . . .

But what can we glean from all of this testimony? Again, it's the three of them. They've all started down that road earlier in the day, reacting to learning about the police taking ahold of that bat. And now this is the next step. And they're all three part of it. And they can say oh, it's the other two. . . . When anybody leaves that camp to carry out the act, it's all three of them.

. . . .

But, you know, the case needs to be evaluated on the basis of the evidence, rationally considered on the basis of the evidence, holding the State to its burden to prove every element of either alternative or any of these charges beyond a reasonable doubt. That's the way our system works. That's the way it should work. It has to work. And that's all I'm asking you to do, evaluate the facts.

We've had a lot of lies on the stand from these individuals involved that we've heard about. But you can glean the truth. It's there to be gleaned. It's there to be seen. Put it together.

8 VRP at 1296-98, 1303, 1317, 1358. The State also argued its theory of the case regarding Crow's specific acts of violence on the night of the murders, consistently referencing witness testimony.

    3. *Alleged Suppression of Jailhouse Writings and the Handwriting Examiner's Report*

An inmate named Aaron Adams provided the State with jailhouse writings that Eke allegedly wrote to him while both were in jail. The jailhouse writings created a conflict of interest between Adams and Crow, both of whom were represented by the same trial counsel. Prior to trial, the trial court allowed trial counsel to withdraw from Crow's case and transferred Crow's case to a new trial counsel. The new trial counsel agreed that Crow's prior attorney could transfer all of the State's discovery directly to him.

Later, an inmate named Anthony McKague provided the State with additional jailhouse writings allegedly written by Eke. A handwriting expert examined the jailhouse writings along with Eke's and McKague's handwriting samples, and filed a report stating he could not determine who wrote the jailhouse writings.

Following Crow's conviction, Crow sent a letter to trial counsel requesting the handwriting expert's report and the jailhouse writings. Trial counsel responded in a letter written on February 29, 2011, stating that:

> I do not have any hand writing expert reports, nor do I have letters purported to be from you or letters written purportedly by Aaron Adams or Anthony McKague actually written by Brian Eke. I know for a fact I did not receive any hand writing expert reports. If there was one done, Assigned Counsel would have had to pay the expert who performed the analysis. Since I had nothing to do with that analysis I have no record of it.

Br. of Petitioner at Ex. 5. Based on this response, Crow alleges the State committed misconduct by failing to disclose the handwriting expert's report.

After Crow filed his PRP, trial counsel filed a declaration stating that the State properly provided him with all discovery, and that upon reviewing his files, "it seems clear" that he was aware of the jailhouse writings at trial, particularly because he cross examined Eke regarding the materials. Br. of Resp't (App. Q, page2). Trial counsel also stated that some of Crow's case file had been destroyed, and that he interpreted Crow's request as limited to handwriting analysis ordered by the defense, rather than by the State.

B.      *Facts Related to Crow's Ineffective Assistance of Counsel Claims*

1. *Refusal To Request a Lesser Included Manslaughter Instruction*

Because Crow was very drunk on the night of the murders, the jury was provided with an intoxication instruction, informing the jury that it may consider the effect of voluntary intoxication on Crow's ability to form intent. Trial counsel considered a lesser included manslaughter instruction, but decided:

> [W]ith this particular case, I couldn't—and I've thought about this for a long time about how any facts in this case would fit into either the reckless or negligence slot. And I can't.
>
> . . . .
>
> I have considered it seriously long, dwelled on it, in fact, but I can't—I just don't see how I would be able to propose those instructions.

7 VRP at 1184-85.

2. *Refusal To Call Adams as a Witness*

Adams told trial counsel's investigator that Eke promised Adams $15,000 in exchange for testifying to facts beneficial to Eke. But Adams also told trial counsel's investigator that Crow informed Adams that "[Crow] got in a fight with [Peterson] or [Miller] but when he left they were in the tent," and that Crow "knocked his (?) ass out and we drug him in the tent but he was alright." Br. of Petitioner (Ex. 9, page 10). Crow wanted trial counsel to call Adams to

testify to Eke's alleged bribery attempt. Trial counsel refused to call Adams despite Crow's insistence, believing that Adams's testimony would not support Crow and would instead benefit the State.[10]

### 3. *Failure To Object to Shoe Print Evidence*

The trial court admitted testimony of a shoe print examiner who had examined a shoe print found on one of the victim's bodies. The examiner excluded Durga and Eke as the shoe print's source, but could neither exclude nor confirm Crow as the shoe print's source. Crow did not object to this evidence at trial.

### 4. *Failure To Spend Sufficient Time Preparing Crow's Case*

At trial, Crow alleged that trial counsel spent insufficient time reviewing Crow's case with him. The record shows trial counsel signed the Thurston County Jail's sign-in sheet two times to talk to Crow. Crow claims trial counsel spent only two hours with him. The Thurston County Jail does not require an attorney to sign in prior to visiting their clients in jail.

### C. *Facts Related to Crow's Erroneous Jury Instruction Claims*

The trial court's jury instruction 30 regarding unanimity on special verdict forms stated in relevant part: "If you are not unanimously satisfied beyond a reasonable doubt that 'yes' is the correct answer to the question in a special verdict form, you must answer 'no' on that special verdict form." CP at 88. Crow did not take exception to any of the final instructions.

---

[10] Crow claims in his reply brief, without citation, that trial counsel told *the jury* that Adams's testimony would benefit the State. But trial counsel made this statement outside of the jury's presence.

ADDITIONAL ANALYSIS

III. PROSECUTORIAL MISCONDUCT

Crow argues the prosecutor committed misconduct by threatening Durga to compel him to falsely testify to Crow's involvement in Miller's assault and murder, by providing his personal opinion in closing argument and by suppressing the jailhouse writings and the handwriting expert's report. We disagree.[11]

In a PRP, prosecutorial misconduct can constitute constitutional error or nonconstitutional error, depending upon the specific misconduct at issue. *See State v. Emery*, 174 Wn.2d 741, 756-59, 278 P.3d 653 (2012); *In re Pers. Restraint of Pirtle*, 136 Wn.2d 467, 485, 965 P.2d 593 (1998). Because we disagree with Crow's assertions that prosecutorial misconduct occurred in his case, we need not decide which standard of prejudice to apply to his prosecutorial misconduct claims.

A.    *Alleged Threats To Coerce Durga To Provide Perjured Testimony*

Crow argues the prosecutor threatened Durga to compel him to falsely testify to Crow's involvement in Miller's assault and murder. We disagree.

We treat unchallenged findings as verities. *State v. Acrey*, 148 Wn.2d 738, 745, 64 P.3d 594 (2003). After a reference hearing, the trial court found that the prosecutor did not threaten Durga, and Crow does not challenge this finding. Thus, the trial court's finding is a verity, and we reject Crow's claim that the prosecutor threatened Durga to compel him to falsely testify.

---

[11] The State argues that many of Crow's claims should be dismissed because they do not fall under any of the reasons listed in RAP 16.4(c). *See In re Pers. Restraint of Cook*, 114 Wn.2d 802, 809, 792 P.2d 506 (1990). We reject this argument because RAP 16.4(c)(7) allows review of a claim wherever "[o]ther grounds exist to challenge the legality of the restraint of petitioner."

17

B.    *Alleged Statements of Personal Opinion in the State's Closing Argument*

Crow next argues that the prosecutor committed misconduct by improperly providing his personal opinion during closing argument. We disagree.

Prosecutors may not give their personal opinions regarding a witness's credibility. *State v. Warren*, 165 Wn.2d 17, 30, 195 P.3d 940 (2008). But prosecutors have wide latitude to argue inferences from the evidence, which includes inferences regarding witness credibility. 165 Wn.2d at 30. We will not find prejudicial error absent a clear and unmistakable expression of personal opinion. 165 Wn.2d at 30.

Crow cites a number of instances in the record where the prosecutor argued that Durga and Eke's testimony was not trustworthy. But in each instance, the prosecutor argued with reference to Eke and Durga's testimony, not from personal opinion:

> Durga is a witness who is quite capable of implanting these little bits of fantasy. And I submit that you see evidence of that in a number of aspects of his story about the events or what happened on the evening that Mr. Miller and Mr. Peterson died."
> . . . [I]f the truth gets in the way of what it is that is of concern to them, then the truth is going to have to go away. And we see that over and over again, the State submits, in their testimony, in both of their testimony, not just in one . . . by considering [Durga and Eke's] testimony, in the light of all the other evidence you have, it is possible to glean the truth . . . . And when you hear Mr. Durga's testimony, you hear a constant theme of protecting my brother. . . . We've had a lot of lies on the stand from these individuals involved that we've heard about.

8 VRP at 1296, 1298 1303 1358. Thus, we hold that the State argued from the testimony at trial, rather than from personal opinion.

Crow also challenges the State's comments in closing argument that discussed Crow's specific actions on the night of the murder. But the State made these arguments with direct, continuous, and explicit references to the evidence, particularly the testimony of Durga, McKague, and Eke. *See also* 8 VRP at 1335 ("[T]he State submits that the evidence that I've

just summarized, if you look at it taken as a whole, [Mr. Crow] made Mr. Peterson unconscious."). Thus, the State did not improperly express its personal opinion during closing argument, but rather argued inferences from the evidence.[12]

C.      *Alleged Suppression of the Jailhouse Writings and Handwriting Expert's Report*

Crow further argues the prosecutor failed to disclose evidence of the jailhouse writings and the handwriting expert's report. We disagree because Crow has failed to state with particularity the factual allegations which, if proven, would entitle him to relief.

The State violates a criminal defendant's due process right if it (1) suppresses evidence that is (2) favorable to the defense and (3) material to guilt or punishment. *Brady v. Maryland*, 373 U.S. 83, 87, 83 S. Ct. 1194, 10 L. Ed. 2d 215 (1963); *see Strickler v. Greene*, 527 U.S. 263, 281-82, 119 S. Ct. 1936, 144 L. Ed. 2d 286 (1999). Evidence is favorable to the defense if it is exculpatory or impeaching. *United States v. Bagley*, 473 U.S. 667, 676, 105 S. Ct. 3375, 87 L. Ed. 2d 481 (1985). The State suppresses evidence by failing to disclose it, regardless of whether the defense requests it. *Strickler*, 527 U.S. at 280.

Here, the only evidence that Crow presents is trial counsel's letter to Crow claiming trial counsel did not have a handwriting expert's report or any jailhouse writings in his case file. But trial counsel later filed a declaration explaining that he received all discovery existing from the State and Crow's original counsel, and that he knew about the jailhouse writings during trial.

---

[12] Crow also makes an ineffective assistance of counsel claim for trial counsel's failure to object to the prosecutor's expression of personal opinion on closing argument. Because the prosecutor did not express his personal opinion, trial counsel was not ineffective for failing to object on those grounds.

Trial counsel also correctly declared that he cross-examined Eke about the jailhouse writings and used one of the jailhouse writings as an exhibit.

While trial counsel's declaration confirms that he could not find the jailhouse writings or handwriting expert's report in his file, he also stated that he destroyed some of Crow's case file. Crow does not point to any evidence that the documents were missing because the State failed to disclose them, rather than because trial counsel lost or destroyed them. Thus, because the record does not support Crow's factual allegations, and Crow has failed to show through affidavits or other forms of corroboration that competent and admissible evidence will establish the factual allegations, Crow's claim fails.

## IV. INEFFECTIVE ASSISTANCE OF COUNSEL

Crow next argues that trial counsel provided ineffective assistance. We disagree.

In a PRP, when the petitioner establishes that he received ineffective assistance of counsel, he has necessarily met his burden to show that a constitutional violation occurred, and that the violation caused actual and substantial prejudice. *In re Pers. Restraint of Crace*, 174 Wn.2d 835, 846-47, 280 P.3d 1102 (2012). We review ineffective assistance of counsel claims de novo, using the two-prong test from *Strickland v. Washington*, 466 U.S. 668, 687, 104 S. Ct. 2052, 80 L. Ed. 2d 674 (1984). *State v. Sutherby*, 165 Wn.2d 870, 883, 204 P.3d 916 (2009); *State v. McFarland*, 127 Wn.2d 322, 334-35, 899 P.2d 1251 (1995).

Under the first prong, the petitioner must show that trial counsel's conduct was deficient, i.e., that it fell below an objective standard of reasonableness based upon all the circumstances. 127 Wn.2d at 334-35. Our scrutiny of trial counsel's performance is highly deferential, employing a strong presumption of effective representation. 127 Wn.2d at 335-36. To rebut this

presumption, the petitioner "bears the burden of establishing the absence of any '*conceivable legitimate tactic explaining counsel's performance.*'" *State v. Grier*, 171 Wn.2d 17, 42, 246 P.3d 1260 (2011) (quoting *State v. Reichenbach*, 153 Wn.2d 126, 130, 101 P.3d 80 (2004)). That a strategy "ultimately proved unsuccessful is immaterial to an assessment of defense counsel's initial calculus; hindsight has no place in an ineffective assistance analysis." 171 Wn.2d at 43. For ineffective assistance of appellate counsel, a defendant must demonstrate the merits of issues counsel failed to argue or argued inadequately. *In re Pers. Restraint of Lord*, 123 Wn.2d 296, 314, 868 P.2d 835 (1994).

Under the second prong, the petitioner must show that counsel's error caused him prejudice, by showing a reasonable probability that the outcome of the trial would have been different absent trial counsel's deficient performance. *State v. Thomas*, 109 Wn.2d 222, 226, 743 P.2d 816 (1987). Failure on either prong of the test is fatal to an ineffective assistance of counsel claim. *Strickland*, 466 U.S. at 697. We reject Crow's ineffective assistance of trial counsel claims.

A.  *Trial Counsel's Refusal To Request a Lesser Included Manslaughter Instruction*

Crow argues that trial counsel provided ineffective assistance by failing to request that a lesser included instruction for manslaughter accompany the intentional second degree murder instruction, despite the evidence at trial that Crow was intoxicated. We disagree.

We grant trial counsel considerable deference in making the tactical decision of whether to ask for a lesser included instruction. *Grier*, 171 Wn.2d at 39. Our Supreme Court has held that where a case's facts lend support to even a remote possibility of acquittal, it is a conceivable

legitimate strategy to avoid providing a lesser included instruction, so as to push the jury into an all or nothing decision that could potentially result in a full acquittal. 171 Wn.2d at 43.

Here, there is at least a remote possibility Crow could have been acquitted on one or both murder charges. The jury could have easily disbelieved the two primary eyewitnesses against Crow (Eke and Durga) because they were complicit in the murder and made statements in their testimony inconsistent with their prior statements to authorities. The jury could have determined that reasonable doubt existed as to where Crow was at the time of one or both murders, and could have determined that there was reasonable doubt as to whether Durga or Eke murdered the victims without Crow's assistance. Thus, trial counsel did not provide Crow with ineffective assistance because trial counsel's decision against requesting a lesser included manslaughter instruction is supported by the conceivable legitimate strategy of pushing the jury into an all-or-nothing decision that could potentially have resulted in Crow's full acquittal.[13]

B.   *Trial Counsel's Refusal To Call Adams as a Witness*

Crow argues that trial counsel provided ineffective assistance by failing to call Adams as a witness to impeach Eke's credibility. We disagree.

Trial counsel stated on the record that he did not call Adams because Adams's testimony would benefit the State. This is a conceivable legitimate tactic in Crow's case because Adams claimed that Crow told him that Crow fought with one of the victims at the crime scene. Thus, calling Adams as a witness risks introducing testimony confirming that Crow was at the crime

---

[13] Crow asks us to apply the three-prong balancing test from *State v. Ward*, 125 Wn. App. 243, 104 P.3d 670 (2004). But our Supreme Court rejected *Ward's* three-prong test in *Grier*, 171 Wn.2d at 32, 35, 38.

scene. And while Adams's testimony could have perhaps impeached Eke's credibility, this would have limited value because the State elicited a great deal of testimony showing that Eke had been caught lying multiple times prior to testifying, and then challenged the credibility of Eke's statements while testifying. Thus, trial counsel's decision against calling Adams was a tactical decision that did not constitute deficient performance.

C.      *Trial Counsel's Failure To Object to Shoe Print Evidence*

Crow argues trial counsel provided ineffective assistance by failing to object to the shoe print evidence's admission because the shoe print examiner's inability to conclude Crow made the shoe print rendered the evidence unfairly prejudicial under ER 403. We hold Crow did not demonstrate prejudice.

To show prejudice, a petitioner basing an ineffective assistance claim on counsel's failure to object to the admission of evidence must show that (1) the trial court would likely have sustained the objection and (2) a more favorable outcome would have resulted absent that evidence. *See McFarland*, 127 Wn.2d at 337, 337 n.4. Evidence is admissible as relevant if it makes any fact more likely than without the evidence. ER 401. "Although relevant, evidence may be excluded if its probative value is substantially outweighed by the danger of unfair prejudice." ER 403.

Here, by excluding the two codefendants as the shoe print's source, the shoe print analyst's evidence made it more likely that Crow was the person who stepped on Peterson's body. Thus, the shoe print evidence was relevant under ER 401. Because Crow's only challenge to the evidence, that it suggested that Crow stepped on Peterson, is the very reason the evidence was relevant, Crow cites no danger of *unfair* prejudice that would preclude the evidence's

23

admission under ER 403. Thus, because the trial court would have admitted the evidence at the conclusion of a CrR 3.6 hearing on its admissibility, no prejudice resulted from trial counsel's failure to ask for that CrR 3.6 hearing.

D.    *Trial Counsel's Failure To Spend Sufficient Time Working on Crow's Case*

Crow argues trial counsel provided ineffective assistance by spending insufficient time working on Crow's case. We hold Crow has failed to state with particularity the factual allegations which, if proven, would entitle him to relief.

Trial counsel had a duty to conduct a reasonable investigation of the case, or to reasonably decide that certain investigations were unnecessary. *In re Pers. Restraint of Davis*, 152 Wn.2d 647, 721, 101 P.3d 1 (2004). Crow's only evidence of trial counsel's failure to spend sufficient time working on his case consists of jail visitor logs showing that trial counsel signed in only twice to visit him. But Crow provides no evidence regarding the amount of time that trial counsel spent on Crow's case outside of the jail. Thus, because Crow has failed to show through affidavits or other forms of corroboration that competent and admissible evidence will establish the factual allegations, Crow's claim fails.[14]

V. Unconstitutional Jury Instructions

Crow argues the jury instructions violated his constitutional right to jury unanimity. We disagree.

---

[14] Because we reject Crow's ineffective assistance of trial counsel claims, we also reject the related claims that appellate counsel was ineffective for failing to raise ineffective assistance of trial counsel on direct appeal.

No. 42926-8-II

We review the adequacy of jury instructions de novo as a question of law. *State v. Pirtle*, 127 Wn.2d 628, 656, 904 P.2d 245 (1995). Jury instructions are sufficient if substantial evidence supports them, they allow the parties to argue their theories of the case, and (when read as a whole) they properly inform the jury of the applicable law. *State v. Hutchinson*, 135 Wn. 2d 863, 885, 959 P.2d 1061 (1998).

A defendant has a constitutional right to a unanimous jury verdict. *State v. Smith*, 159 Wn.2d 778, 783, 154 P.3d 873 (2007). Because an instruction that violates the defendant's right to unanimity is a constitutional error, the defendant must demonstrate actual and substantial prejudice to prevail. *See* WASH. CONST. art. I, §§ 21, 22; *State v. Lamar*, 180 Wn.2d 576, 583, 327 P.3d 46 (2014); *State v. Watkins*, 136 Wn. App. 240, 244, 148 P.3d 1112 (2006).

A. *Unanimity as to "No" on the Special Verdict Form*

Crow argues that jury instruction 30 was erroneous.[15] We hold that Crow has failed to demonstrate actual prejudice.

Here, jury instruction 30 stated "[I]f you are not unanimously satisfied beyond a reasonable doubt that 'yes' is the correct answer to the question in a special verdict form, you *must answer* 'no' on that special verdict form." (Emphasis added.) Under this instruction, the jury must answer no on the special verdict form in all situations where the jury cannot reach a unanimous decision that "yes" was the correct answer, even if the jury failed to reach a

---

[15] Crow argues jury instruction 30 misled the jury into believing that it had to be unanimous as to "no" before answering "no" on the special verdict form, by not including language specifically stating that the jury "did not have to be unanimous as to 'no'" to answer "no" on the special verdict form. Br. of Petitioner at 19. Were this the case, jury instruction 30 would be in keeping with *State v. Nunez*, which *encouraged* instructions for special verdict forms that require the jury to unanimously agree that "no" is the correct answer before answering "no" on a special verdict form. 174 Wn.2d 707, 718-19, 285 P.3d 21 (2012).

25

unanimous decision that "no" was the correct answer. Thus, additional language stating that the jury does not have to unanimously agree that "no" was the correct answer to select "no" on the special verdict form would have been superfluous. Therefore, Crow has failed to show that the absence of such language caused actual and substantial prejudice.

B.     *Unanimity as to the Means of Second Degree Homicide*

Finally, Crow argues that the jury instructions erroneously failed to require the jury to unanimously agree on whether Crow committed felony second degree murder or intentional second degree murder. We disagree.

"Criminal defendants in Washington have a right to a unanimous jury verdict." *State v. Ortega–Martinez*, 124 Wn.2d 702, 707, 881 P.2d 231 (1994). While the jury must be unanimous as to which act or incident constituted the crime, the jury is not required to be unanimous as to the legal means by which the defendant committed the crime (such as felony murder versus intentional murder), as long as sufficient evidence supports each alternative on which evidence or argument was presented. *Smith*, 159 Wn.2d at 783.

When reviewing the record for sufficiency of the evidence, we ask whether, taking all facts in the light most favorable to the State, any rational trier of fact could find guilt beyond a reasonable doubt. *Salinas*, 119 Wn.2d at 201. We draw all reasonable inferences in favor of the State and interpret them most strongly against the petitioner. 119 Wn.2d at 201.

RCW 9A.32.050 states that a person is guilty of second degree murder in one of two ways:

> (a) With intent to cause the death of another person but without premeditation, he or she causes the death of such person . . . or
> > (b) He or she commits or attempts to commit any felony, including assault . . . and, in the course of and in furtherance of such crime or in immediate flight

therefrom, he or she, or another participant, causes the death of a person other than one of the participants.

Former RCW 9A.08.020 (1976) states that an accomplice to a crime is guilty of the underlying crime. *See State v. Teal*, 152 Wn.2d 333, 339, 96 P.3d 974 (2004). If the jury is unanimous that the defendant was a participant in the crime and that the crime was committed, it is not necessary that the jury be unanimous that the defendant was a principal or an accomplice. 152 Wn.2d at 339.

Former RCW 9A.08.020(3)(a) states that a person is an accomplice if "[w]ith knowledge that it will promote or facilitate the commission of the crime, he

(i) solicits, commands, encourages, or requests such other person to commit it; or
(ii) aids or agrees to aid such other person in planning or committing it.

Eke's testimony supported that Crow hit Miller in the face, followed immediately by Durga putting Miller in a choke hold until Miller was incapacitated and dragging his body into the campsite fire. The Olympia police found Miller's dead body in the campsite fire. This is sufficient evidence that Crow was an accomplice to Durga's intentional murder of Miller (which establishes intentional murder) or that Crow committed a felony assault that allowed Durga to get Miller in a choke hold, causing Miller's death (which establishes felony murder). Thus, sufficient evidence supports both intentional murder and felony murder in regards to Miller.

Eke's testimony at trial also supported that Crow put Peterson in a choke hold until Peterson was incapacitated, threw his body into the campsite fire, and stepped on his shoulders while Peterson was in the fire. The Olympia police found Peterson's dead body at the campsite. This is sufficient evidence that Crow intentionally strangled Peterson to death (intentional murder), or that Crow assaulted Peterson by strangling him, and that this assault caused his death

No. 42926-8-II

(felony murder). Thus, because sufficient evidence supports both means for each of the two murders, the jury did not have to be unanimous as to whether Crow committed intentional murder or felony murder for either murder.

We deny the remainder of Crow's petition.

_____
Worswick, P.J.

We concur:

_____
Melnick, J.

_____
Sutton, J.