[No. 49608-5-I.   Division One.   June 30, 2003.]

The State of Washington, *Respondent*, v. Dale R. Williams, *Appellant*.

*Jennifer L. Dobson* (of *Nielsen, Broman & Koch, P.L.L.C.*), for appellant.

*Norm Maleng, Prosecuting Attorney*, and *Julie Dee Cook, Deputy*, for respondent.

Schindler, J. — Dale R. Williams appeals his conviction of fourth degree assault, domestic violence, arguing that the trial court erred by denying his motion to withdraw his guilty plea. The trial court did not abuse its discretion by denying the motion. We affirm.

## FACTS

On July 15, 2001, Dale Williams was at home with his 21-year-old son, Sean Williams; Sean's wife, Lisa; and his three grandchildren, three-year-old Taylar Williams, four-year-old Tristin McCready, and seven-year-old Austin McCready. Taylar is the daughter of Sean and Lisa Williams. Tristin and Austin are the children of Cindy McCready, who is Dale Williams' wife's daughter.

Sean was babysitting the three children. Tristin's and Austin's mother, Cindy, was not present. Tristin and Austin were together playing downstairs. Tristin argued with Taylar over a piece of candy. During the argument, Tristin cut Taylar's finger with a pair of scissors, and her finger began to bleed badly. Austin saw what happened and

screamed. Dale and Sean Williams, who were upstairs, heard the screaming and came downstairs.

When Sean saw his daughter's finger bleeding, he grabbed Tristin by the shirt and threw him onto a bed, yelling, "don't you ever touch my daughter again."[1] He then began to hit Tristin with his hands on Tristin's back and sides. Tristin cried and apologized. Sean then went back upstairs to check on Taylar who was with her mother, Lisa, in the kitchen.

Dale Williams came downstairs and asked Tristin where the scissors were that he used to cut Taylar's finger. When Tristin did not respond, Dale Williams put Tristin face down on the bed and hit him three times on the buttocks, yelling "Don't you ever do that again."[2] According to Austin, Dale Williams hit Tristin so hard that he "was flying over the bed."[3] After he hit Tristin three times, Tristin said he was sorry. Dale Williams told him it was too late to be sorry and asked Tristin again where the scissors were. Tristin did not respond. Dale Williams put Tristin back on the bed face down and hit him two more times on the buttocks. He stopped hitting him when Austin found the scissors.

Meanwhile, Lisa took Taylar to the emergency room at the hospital.[4] After they left, Sean came back downstairs with a knife and a bottle of hot sauce from the kitchen. He dipped the knife into the hot sauce and forced Tristin to lick the sauce off the blade of the knife. Sean Williams told Tristin that he would give him a drink of soda every time Tristin answered one of his questions. After Tristin had answered several questions, he asked to go upstairs to the bathroom.

While Tristin was in the bathroom, Dale Williams removed the belt he was wearing and handed it to Sean. Sean went into the bathroom carrying scissors and cut Tristin on

[1] Clerk's Papers (CP) at 3.

[2] CP at 4.

[3] CP at 4.

[4] The cut on her finger required stitches.

his chest. Then, Sean forcibly dragged Tristin downstairs and told him to get on his hands and knees. Sean hit Tristin two times on his buttocks with the belt, then put the belt down and hit Tristin with his hands. Dale Williams then picked up the belt and hit Tristin with the belt and also hit him with his hands.

Later, Tristin's mother, Cindy McCready, arrived at the house. She found Tristin hiding in a corner. Tristin told his mother he had been hit with a belt. McCready lifted up Tristin's shirt and found cuts on his back, large red welts on his back and buttocks, and blood on the front of his shorts.

When McCready asked who had hit Tristin, Sean told her he had. Dale Williams then began to yell at McCready, telling her that her children had no idea what discipline was. McCready cleaned the blood off Tristin, took Tristin and Austin home, and called the police.

The investigating officer advised Dale and Sean Williams of their *Miranda*[5] rights. Afterwards, Sean told the officer that he had struck Tristin twice on the buttocks with his hands and his father, Dale, had struck Tristin once with his hands. Sean did not remember anyone hitting Tristin with a belt. Dale Williams told the officer that the marks on Tristin were "red marks only" that did not disappear as quickly as they did on other people because Tristin has fair skin.[6]

A physician examined Tristin the next day and determined that his injuries were the result of an assault.

On July 19, 2002, the State charged Dale Williams and Sean Williams as codefendants with assault of a child in the third degree, domestic violence. In exchange for a joint guilty plea, the State later amended the information and reduced the charge against both men to a misdemeanor assault in the fourth degree, domestic violence.

On September 27, 2001, a plea hearing was held at which both Dale Williams and Sean Williams individually pleaded

[5] *Miranda v. Arizona*, 384 U.S. 436, 86 S. Ct. 1602, 16 L. Ed. 2d 694 (1966).

[6] CP at 5.

guilty to fourth degree assault, domestic violence. Dale Williams signed a statement on plea of guilty. When asked to describe in his own words what he did that resulted in his being charged with this crime, Dale Williams stated:

> On July 15, 2001 in King County Washington I spanked Tristin McCready in a manner that was offensive and amounted to Aslt 4–DV. Tristin was spanked because I was trying to find the location of the cutting utensil used to injure Taylor [sic] Williams, my granddaughter.[7]

In the statement on plea of guilty, he acknowledged that no one made promises or threatened harm of any kind to him or to any other person to cause him to plead guilty.

Both the State and the trial court conducted a colloquy with each defendant about his desire to plead guilty. The court informed Dale Williams of the nature of the charges against him, the consequences of entering the plea, what the State's recommendation would be at sentencing, and that the court did not have to follow the State's recommendation.

During the hearing, Dale Williams told the court that his counsel answered all the questions he had about his statement on plea of guilty to his satisfaction and that his statements were true and accurate. When asked by the court, he stated that he had no questions that remained unanswered. As he acknowledged in his written statement on plea of guilty, Williams orally told the court that, other than the sentencing recommendation, no one had made threats or promises or coerced him in any way to cause him to enter the plea. He also brought up the fact that the plea was a joint plea:

> THE COURT: And other than the [sentencing] recommendation, has anyone else made an[y] threats or promises, or coerced you in any fashion to get you to do this today other than the obvious, I guess, which would be the option of going to trial and taking a chance of getting convicted of assault in the third degree, but other than that, has anyone—

---

[7] CP at 10.

MR. DALE WILLIAMS: One more point would be the fact that it had to be done as a co-plea.

THE COURT: Okay.

MR. DALE WILLIAMS: That part.

THE COURT: Well, other than that, which I gather what you are saying is, the condition was that both of you plead guilty, correct?

DEFENDANT DALE WILLIAMS: Right.

THE COURT: Other than that, did anyone strong-arm you in any way to get you to do this, or is this a choice that you are making on your own?

DEFENDANT DALE WILLIAMS: It's of my own volition.

THE COURT: Okay. Fair enough. . . .[8]

Dale Williams' counsel told the trial court that he reviewed the statement on plea of guilty with his client and believed his client was making a knowing, intelligent, and voluntary waiver of his rights.

The trial court accepted Dale Williams' guilty plea as knowing, intelligent, and voluntary, and made with a full understanding of its consequences. The court found that his statement on plea of guilty provided a factual basis for the plea. As part of the plea agreement between Dale Williams and the State, the court ordered Williams immediately released.

The day before sentencing, Dale Williams filed a written motion to withdraw his guilty plea, arguing that his plea was involuntary because he was forced to plead guilty in order for his son, Sean, to get the benefit of a reduced charge. Attached to his motion was a four-page statement in which Dale Williams again admits he hit Tristin on two occasions when Tristin would not tell him where the scissors were that he used to cut Taylar. He also states that, on the morning of the omnibus hearing, he learned for the first time that the State planned to offer Sean a plea bargain to a fourth degree assault charge. Later that day, his attorney

---

[8] Report of Proceedings (RP) at 14-15.

told him that the pleas were a package deal and that if he did not enter a guilty plea, the State would not offer a plea bargain to his son. Williams stated that he agreed to the plea bargain solely to spare his son from the possibility of a felony conviction.[9] He concludes his statement by stating that, after researching the issue, he believes that the State had no authority to offer a plea bargain as a package deal and that his motion to withdraw his guilty plea should be granted on the basis of a manifest injustice.

At the hearing held the next day on the motion to withdraw the guilty plea, the court informed Williams that it had reviewed his four-page statement and offered him the opportunity to add anything further to the record. He declined to add anything further, stating that his statement "covers the gist of" his argument.[10]

The court stated that it was aware that Dale Williams' plea was part of a package deal when it accepted the plea. The court saw no legitimate basis for withdrawing the plea because the package deal was "on the table from the beginning."[11] Finding no manifest injustice that would necessitate withdrawal of the plea, the court denied Williams' motion to withdraw. The court entered judgment on the guilty plea and sentenced him to 12 months, suspended upon serving 60 days, with credit for 72 days already served.

---

[9] "I felt that my son could very possibly be convicted of a third degree assault, and would thereby have a felony of Child Assault to which he'd have to be looking at for the rest of his life. I couldn't let him face that and took the plea bargain as it stood because neither I nor my attorney knew any better as to what the law was regarding a joint plea." CP at 25.

[10] RP at 24.

[11] "But quite frankly, and I have got to tell you, Mr. Williams, from a legal perspective, I don't see any legitimate basis for withdrawing the plea. The issue that you have raised is an issue that was before you at the time of the entry of the plea. In fact, we just briefly touched on it in the course and conduct of taking the plea, it's not an unintended consequence, it was on the table from the beginning, so I don't find any manifest injustice to permit withdrawal of the plea at this point in time." RP at 28.

## DISCUSSION

▮ We review a trial court's denial of a defendant's motion to withdraw a guilty plea for abuse of discretion.[12] A decision based on clearly untenable or manifestly unreasonable grounds constitutes an abuse of discretion.[13]

▮▮ Under CrR 4.2(f), a court must allow a guilty plea to be withdrawn if withdrawal is necessary to correct a manifest injustice.[14] This rule imposes a demanding standard on the defendant to demonstrate " 'an injustice that is obvious, directly observable, overt, not obscure.' "[15] A manifest injustice may arise where a defendant's plea was involuntary.[16]

▮ The voluntariness of a plea is determined by considering the relevant circumstances surrounding it.[17] A guilty plea is involuntary and invalid if it is obtained by mental coercion overbearing the will of the defendant.[18] The trial court has a duty to ascertain that a guilty plea is voluntary before accepting it.[19] Because a guilty plea constitutes a waiver of constitutional rights, the inquiry into voluntariness is constitutionally mandated.[20]

Williams argues that his plea was involuntary because the trial court was not informed that the plea was part of a package deal and therefore did not make the necessary

[12] *State v. Moon*, 108 Wn. App. 59, 62, 29 P.3d 734 (2001).

[13] *State v. Jamison*, 105 Wn. App. 572, 590, 20 P.3d 1010, *review denied*, 144 Wn.2d 1018 (2001).

[14] "The court shall allow a defendant to withdraw the defendant[']s plea of guilty whenever it appears that the withdrawal is necessary to correct a manifest injustice." CrR 4.2(f).

[15] *State v. Branch*, 129 Wn.2d 635, 641, 919 P.2d 1228 (1996) (quoting *State v. Saas*, 118 Wn.2d 37, 42, 820 P.2d 505 (1991)).

[16] *State v. Wakefield*, 130 Wn.2d 464, 472, 925 P.2d 183 (1996).

[17] *Brady v. United States*, 397 U.S. 742, 749, 90 S. Ct. 1463, 25 L. Ed. 2d 747 (1970).

[18] *Id.* at 750.

[19] *Boykin v. Alabama*, 395 U.S. 238, 242, 89 S. Ct. 1709, 23 L. Ed. 2d 274 (1969).

[20] *Id.* at 243.

inquiry about whether the plea was entered voluntarily and because he felt pressured to plead guilty so his son could benefit from the reduced charge.

In *State v. Cameron*,[21] this court followed federal precedent and recognized that "special care should be taken in reviewing guilty pleas entered in exchange for a prosecutor's promise of lenient treatment of a third party."[22] Although package deal plea agreements are not per se impermissible, federal courts are concerned that "they pose an additional risk of coercion not present when the defendant is dealing with the government alone."[23] "Quite possibly, one defendant will be happier with the package deal than his codefendant(s); looking out for his own best interests, the lucky one may try to force his codefendant(s) into going along with the deal."[24] Thus, "a prosecutor's offer during plea bargaining of adverse or lenient treatment for some person *other* than the accused . . . might pose a greater danger of inducing a false guilty plea by skewing the risks a defendant must consider."[25] Federal courts require the government to inform the court that the codefendants are entering pleas as part of a package deal to allow the court to take the requisite special care in the case of package deals.[26] Indeed, one court has stated that disclosure of the existence of a package deal is "crucial" at the hearing on the guilty plea so that the court "may probe as deeply as needed into the possibility that one defendant is pleading guilty against his will in order to make it

[21] 30 Wn. App. 229, 633 P.2d 901 (1981).

[22] *Id.* at 231.

[23] *United States v. Caro*, 997 F.2d 657, 659 (9th Cir. 1993).

[24] *Id.*

[25] *Bordenkircher v. Hayes*, 434 U.S. 357, 364 n.8, 98 S. Ct. 663, 54 L. Ed. 2d 604 (1978). For example, one codefendant may be happier with the plea than the other and may try to force the codefendant into going along with the deal. *Caro*, 997 F.2d at 659-60.

[26] *United States v. Martinez-Molina*, 64 F.3d 719, 733 (1st Cir. 1995); *Caro*, 997 F.2d at 659-60; *see also* FED. R. CRIM. P. 11(c)(2) ("The parties must disclose the plea agreement in open court when the plea is offered, unless the court for good cause allows the parties to disclose the plea agreement in camera.").

possible for his codefendant to obtain the benefit of a favorable plea and sentencing recommendation."[27]

But, altruistic or subjective reasons for entering a plea are not grounds to set aside the plea. A plea is not invalid if entered pursuant to a plea agreement that includes leniency for a third party[28] or in response to a prosecutor's justifiable threat to prosecute a third party if the plea is not entered.[29]

Taking special care means that when a court is informed that a plea is part of a package deal, the court must specifically inquire about whether the codefendant pressured the defendant to go along with the plea and carefully question the defendant to ensure he is acting of his own free will. The most crucial inquiry is whether the codefendant pressured the defendant into going along with the plea.[30] It is also important to determine whether the defendant has had sufficient opportunity to meet and discuss the case and alternatives with his attorney.

██ ██ Here, the prosecutor did not expressly inform the trial court that the pleas of Dale and Sean Williams were a package deal. Although we conclude that the prosecution has an obligation to inform the court that the codefendant's plea is part of a package deal, the State's failure to do so in this case is harmless because it did not prejudice Williams or affect the outcome of the proceeding.[31]

We conclude that the State's omission is harmless for four reasons. First, the guilty pleas were entered at the same time by the same judge. Second, the trial court stated on the record during the hearing on the motion to withdraw the

---

[27] *United States v. Abbott*, 241 F.3d 29, 34 (1st Cir. 2001).

[28] *Cortez v. United States*, 337 F.2d 699 (9th Cir. 1964).

[29] *United States v. Castello*, 724 F.2d 813 (9th Cir. 1984).

[30] *See, e.g., Caro*, 997 F.2d at 660 (holding that the voluntariness of the defendant's plea was called into question where the trial court failed to investigate whether the codefendants pressured the defendant into entering the plea).

[31] *See State v. Miller*, 131 Wn.2d 78, 90, 929 P.2d 372 (1997); *State v. Gonzales*, 90 Wn. App. 852, 855, 954 P.2d 360 (1998).

plea that he knew the pleas were a package deal. Third, the trial court held a hearing on the motion to withdraw and gave Williams the opportunity to present evidence about whether he was subjected to threats or undue pressure from his son with respect to his guilty plea. And at that hearing, Williams did not assert that there were any direct threats or promises by his son to induce him to plead guilty. Finally, the evidence presented at the hearing on the guilty plea and Williams' responses to the court's questions clearly indicate that the guilty plea was freely and voluntarily made. As discussed above, the trial court specifically asked Williams if anyone had forced him to plead guilty, and Williams unequivocally responded in the negative. Such statements in open court during a hearing on a guilty plea carry a strong presumption of voluntariness.[32] Williams does not claim that he did not have a sufficient opportunity to meet with his attorney and discuss alternatives. Also as discussed, Williams' counsel told the court that he believed his client was making a knowing, intelligent, and voluntary waiver of his rights.

The only evidence Williams presented at the time the plea was entered and at the hearing on his motion to withdraw the plea was that he felt pressured to enter into the plea agreement because he did not want his son to have a felony conviction. Where, as here, there is no evidence of any promises or threats to the defendant other than those represented in the written plea agreement, where the defendant signs the written plea agreement acknowledging guilt in his own words, and where the defendant states that no promises were made other than those in the plea agreement, the trial court properly accepts the plea as being the result of the defendant's own volition and freely and voluntarily made. Although Williams was undoubtedly influenced at least in part by a desire to help his son, the

---

[32] *State v. Perez*, 33 Wn. App. 258, 261-62, 654 P.2d 708 (1982) (stating that where the defendant acknowledges the truth of his written statement on plea of guilty, and the court questions the defendant and satisfies itself on the record that the various criteria of voluntariness exist, the presumption of voluntariness is "well nigh irrefutable").

desire to help a loved one and the accompanying emotional and psychological pressure do not, standing alone, render a guilty plea involuntary.[33]

We affirm the trial court.

ELLINGTON and APPELWICK, JJ., concur.

---

[33] *Cortez*, 337 F.2d at 701-02; *Kent v. United States*, 272 F.2d 795 (1st Cir. 1959).