# IN THE COURT OF APPEALS OF THE STATE OF WASHINGTON

## DIVISION II

| | |
|---|---|
| STATE OF WASHINGTON, | No. 56309-6-II |
| Respondent, | |
| v. | |
| CHRISTINE NICOLE MILLS, | UNPUBLISHED OPINION |
| Defendant, | |
| and | |
| JAMES RUSSELL BRADY, | |
| Appellant. | |

GLASGOW, C.J.— In 2020, James Russell Brady was dating Christine Mills. The couple had an altercation with the father of Mills' children when they were exchanging the children after residential time with the father. The State charged Brady with several counts including second degree assault, a most serious or strike offense. If convicted as charged, Brady would be sentenced to life in prison as a persistent offender. The State also charged Mills after the incident.

Brady's primary concern was preventing jail time for Mills. The State offered the codefendants joint plea deals available only if they both accepted. Brady's offer let him plead guilty to crimes that would not result in life in prison. Mills' offer stated that the State would not oppose her request to serve her entire sentence on home confinement. Based on what his counsel told him, Brady believed Mills would receive a home confinement sentence.

Both codefendants accepted the plea offers. Brady agreed to and was sentenced to 300 months, an exceptional sentence above the standard range. The trial court also imposed a crime victim penalty assessment. For Mills, the trial court imposed a three-month sentence, but the court allowed her to serve only the last 30 days on home confinement.

Brady then moved to withdraw his guilty plea, arguing that the State had breached his plea agreement by not supporting Mills' request for home confinement. The trial court denied Brady's motion to withdraw.

Brady appeals. He argues that the trial court should have allowed him to withdraw his plea because he received ineffective assistance of counsel at every stage. And he asserts that we must remand for the trial court to strike the imposition of the crime victim penalty assessment.

We remand for the trial court to strike the crime victim penalty assessment from Brady's judgment and sentence. We otherwise affirm.

FACTS

According to the declaration of probable cause, Brady and Mills had an altercation with the father of Mills' children and his new partner during an exchange of the children after residential time with the father. During the incident, Brady pointed a gun at both the children's father and his partner, and Mills allegedly grabbed the partner by the hair and slammed her head against a car.

The State prosecuted Brady and Mills as codefendants. The State charged Brady with two counts of second degree assault and one count of first degree unlawful possession of a firearm. Brady had prior convictions for vehicular assault and second degree assault, which were strike offenses under the Persistent Offender Accountability Act of the Sentencing Reform Act of 1981, ch. 9.94A RCW, so the current assaults, if proven, would subject him to life in prison. RCW

9.94A.030(32)(b), (p).[1] The State charged Mills with two counts of second degree assault and one count of fourth degree assault.

## I. PLEA PROCEEDINGS

Early in proceedings, the State alerted the trial court that it had made a "global offer" of plea deals to both defendants "that require[d] them both to accept." Verbatim Rep. of Proc. (VRP) (June 16, 2021) at 19. Brady's plea offer allowed him to plead guilty to two counts of third degree assault, one count of first degree unlawful possession of a firearm, and one count of second degree unlawful possession of a firearm to avoid the mandatory life sentence he would receive if convicted of second degree assault. Instead, the State would recommend an agreed exceptional sentence of 300 months. The State's offer to Mills allowed her to plead guilty to two counts of felony harassment with a sentencing recommendation of three months. The plea agreement stated that Mills was "allowed to argue to convert jail to [home confinement]" time, but the State did not promise to *recommend* home confinement. Clerk's Papers (CP) at 293

Brady and Mills each accepted the plea offers. In a written statement, Brady explained that he was pleading guilty because he "committed more serious offenses which could constitute a third strike, and [he was] accepting the offer from the State of Washington to plead to less serious offenses to avoid the substantial likelihood that [he] would be sentenced to life in prison on the original charges." CP at 168. Brady agreed to an exceptional sentence recommendation of 300 months, and he acknowledged that he understood "[t]he judge does not have to follow anyone's recommendation as to sentence." CP at 162.

---

[1] The list of strike offenses has been amended since Brady's offenses in 2020, but the relevant language pertaining to his strike offenses has not changed, so we cite to the current placement within the statute.

At a hearing on the plea, the trial court conducted a colloquy to determine whether Brady understood the charges, the possible sentencing ranges, and the exceptional sentence that he had agreed to. VRP (June 29, 2021) at 68-74. The trial court asked Brady, "Other than promises set forth in the plea agreement, . . . have any promises been made to you to . . . induce you or cause you to want to plead guilty today?" *Id*. at 74-75. Brady answered, "No," and asserted that he was acting voluntarily in pleading guilty. *Id*. at 75. The trial court found that Brady was acting knowingly, intelligently, and voluntarily and accepted his guilty plea. *Id*. at 77-78.

## II. SENTENCINGS

At sentencing, Brady asked the court "for leniency, but not for [himself], for Ms. Mills, who is just another victim in this." VRP (July 19, 2021) (Brady) at 10. He believed that because he had pleaded guilty, the "State would allow Ms. Mills to take advantage of a plea deal herself [for] . . . house arrest or something in that nature." *Id*.

The trial court followed the agreed recommendation in Brady's plea agreement and imposed an exceptional upward sentence of 300 months based on Brady's high offender score and stipulation to the exceptional sentence. The trial court found that Brady was indigent under RCW 10.101.010(3)(c) because his annual income was less than 125 percent of the federal poverty level. Thus, the trial court imposed only one mandatory legal financial obligation, the crime victim penalty assessment.

At Mills' sentencing, which occurred immediately after Brady's, the prosecutor stated that he knew Mills was going to request home confinement. "[T]hat is something that . . . I said that [Mills] could argue for because of COVID because the jail is overcrowded, especially with regards with females, because of the coronavirus, the capacity over there is extremely limited." VRP (July

4

19, 2021) (Mills) at 6. The State asked the trial court to impose a three-month sentence but did not specifically request home confinement. Mills and her attorney both requested a sentence of home confinement.

The trial court stated that it could not "look at what happened in this case and say that electronic home monitoring is an appropriate outcome because it is not." *Id*. at 15. "This case is too serious for it to be handled simply as go home and strap on an ankle bracelet and promise to be good." *Id*. The trial court emphasized that, per police reports, Mills "actually assaulted [the partner] at one point, violently assaulted her." *Id*. The trial court imposed three months of confinement but allowed Mills to serve the final 30 days on home confinement.

### III. MOTION TO WITHDRAW PLEA

The day after sentencing, Brady sent the trial court a letter seeking to withdraw his guilty plea. He also filed a CrR 7.8(b) motion to withdraw his plea. The trial court allowed plea counsel to withdraw and appointed Brady new counsel.

The new counsel then moved to withdraw Brady's guilty plea. Brady stated that he had been told by his plea attorney that the State would recommend a home confinement sentence for Mills. He argued in part that the "State did not keep its agreement" to do so.[2] CP at 214.

At a plea withdrawal hearing, Brady's plea counsel testified that Brady was concerned about Mills receiving home confinement as part of her plea deal, leading the attorney to contact Mills' counsel:

> Ultimately, my understanding [was] that Ms. Mills had been offered a deal, which would allow her to do electronic home monitoring. At one point I received a call

---

[2] Brady also argued that there was not a sufficient factual basis for his guilty plea to the third degree assault charges, and that the plea agreement contained incorrect offense dates for some of the charges. These arguments are not at issue on appeal.

from Mr. Brady and [he] said that he had spoken with Ms. Mills, [and] she said the agreement may not be for that. . . .

I called [Mills' attorney]. I said, is Christine Mills getting [home confinement] or is she going to jail? And he said, she's getting [home confinement]. I said, cool. And then I relayed that to Mr. Brady that - that she was getting [home confinement].

VRP (Oct. 8, 2021) at 99. Plea counsel then explained that it was well known that the trial court did not have to accept any sentencing recommendation from the parties:

[WITHDRAWAL COUNSEL]: Did you convey to Mr. Brady any promise that the State would make to Mr. Brady about what they would do in their recommendation on Ms. Mills' case?

[PLEA COUNSEL:] I don't know that [the prosecutor] made a promise to me or to Mr. Brady. But there was a definite understanding . . . that Ms. Mills was looking at electronic home monitoring. I mean obviously everyone knows that the ultimate sentence is up to the judge. That's in every plea agreement. But it was our understanding that the State . . . had left that open for Ms. Mills, whether it had been a joint recommendation or no objection.

*Id.* at 100. Plea counsel also stated that he and Mills' attorney were both from Pierce County, where "when the prosecution says no objection to electronic home monitoring, that is essentially our parlance [t]here for you're getting electronic home monitoring." *Id.* Plea counsel did not call the prosecutor to confirm the information from Mills' attorney, and counsel stated that he never sought to review a codefendant's plea agreement unless that person had agreed to testify against his client.

Brady also testified at the hearing. He said that plea counsel had told him that the State would recommend—not just not oppose—home confinement for Mills. He asserted that he would not have pleaded guilty if he had known that the State did not intend to support Mills' request for home confinement. On cross-examination, Brady acknowledged that "the decision is up to the judge" for what sentence to impose in every case, which he knew because he had pleaded guilty in other cases. *Id.* at 107. And Brady's withdrawal counsel acknowledged that Brady's plea agreement did not contain any promises about Mills' sentence.

6

The trial court stated that it understood Brady's argument as contending that he wanted to withdraw his plea "because another defendant's attorney misinformed Mr. Brady's attorney of what [Mills'] plea agreement was and then Mr. Brady's attorney conveyed that [misinformation] to Mr. Brady." *Id*. at 111. When withdrawal counsel argued that plea counsel rendered ineffective assistance by not confirming Mills' plea offer with the State, the court rejected the argument that "[plea counsel] did anything that was ineffective or fell . . . below the appropriate standard of care . . . I don't believe there's a problem with [plea counsel] relying upon the statements made to him by [Mills' attorney]." *Id*. at 112-13. The trial court also explained that it did not believe that the State had failed to keep any promise to Brady, because "the plea agreement with Mr. Brady does not refer in any way to promises made in the Mills plea agreement." *Id*. at 124. And the trial court emphasized that Brady had made both oral and written affirmations that no promises except those in his plea agreement caused him to plead guilty. The trial court denied Brady's motion to withdraw his plea.

Brady appeals the order denying his motion to withdraw his plea.

## ANALYSIS

### I. INEFFECTIVE ASSISTANCE OF COUNSEL

Brady contends that we must remand for the trial court to allow Brady to withdraw his plea to correct a manifest injustice. Brady argues that he received ineffective assistance of counsel during plea negotiations because plea counsel failed to conduct a reasonable investigation into the details of Mills' plea offer or alert the trial court that the plea offers were related. Brady asserts that plea counsel should have confirmed whether the State would endorse Mills' request for a home confinement sentence with the prosecutor, and he should have inquired about the sentencing

7

practices of judges in Grays Harbor County. Brady argues the failure to do so was "affirmative misadvice" that prejudiced Brady because he would not have otherwise pleaded guilty. Br. of Appellant at 45. As a result, he insists that his guilty plea was not knowing, intelligent, and voluntary. We disagree.

We review a trial court's order on a motion to withdraw a guilty plea for abuse of discretion. *State v. Lamb*, 175 Wn.2d 121, 127, 285 P.3d 27 (2012). "A trial court abuses its discretion if its decision 'is manifestly unreasonable or based upon untenable grounds or reasons.'" *Id.* (quoting *State v. Powell*, 126 Wn.2d 244, 258, 893 P.2d 615 (1995)). If a motion to withdraw a guilty plea was made after judgment was entered, withdrawal of the plea must meet the requirements of CrR 7.8. *Id.* at 128. A defendant may withdraw their guilty plea if the plea was not knowing, intelligent, or voluntary. *See In re Pers. Restraint of Stockwell*, 179 Wn.2d 588, 595, 316 P.3d 1007 (2014). "[A] defendant's denial of improper influence in open court" is highly persuasive evidence that the defendant's plea was voluntary, although it is not dispositive. *State v. Osborne*, 102 Wn.2d 87, 97, 684 P.2d 683 (1984).

A.     Cases Addressing Effective Assistance in the Plea Process

"The Sixth Amendment right to effective assistance of counsel encompasses the plea process." *State v. Sandoval*, 171 Wn.2d 163, 169, 249 P.3d 1015 (2011). "Counsel's faulty advice can render the defendant's guilty plea involuntary or unintelligent." *Id.* However, we strongly presume that counsel performed effectively. *In re Pers. Restraint of Lui*, 188 Wn.2d 525, 539, 397 P.3d 90 (2017). A defendant seeking to withdraw their plea based on counsel's inadequate advice must establish that counsel performed deficiently and that the deficient performance prejudiced the defendant. *In re Pers. Restraint of Tricomo*, 13 Wn. App. 2d 223, 237, 463 P.3d 760 (2020).

The failure to demonstrate either prong of the test will end our inquiry. *State v. Classen*, 4 Wn. App. 2d 520, 535, 422 P.3d 489 (2018). To establish prejudice related to a guilty plea, "a defendant must show that there is a reasonable probability that, but for the deficiency, [they] would not have pleaded guilty and would have insisted on going to trial." *Tricomo*, 13 Wn. App. 2d at 237

"[A] defense attorney has a basic duty to know and apply relevant statutes and professional norms, and the unreasonable failure to fulfill that duty is constitutionally deficient." *In re Pers. Restraint of Yung-Cheng Tsai*, 183 Wn.2d 91, 101 n.1, 351 P.3d 138 (2015). Counsel's decisions that were made based on an investigation "'are reasonable precisely to the extent that reasonable professional judgments support the limitations on investigation.'" *Lui*, 188 Wn.2d at 539 (internal quotation marks omitted) (quoting *Wiggins v. Smith,* 539 U.S. 510, 521, 123 S. Ct. 2527, 156 L. Ed. 2d 471 (2003)).

During plea bargaining, counsel has a duty to "'actually and substantially'" assist the defendant in determining whether to plead guilty. *State v. Stowe*, 71 Wn. App. 182, 186, 858 P.2d 267 (1993) (quoting *Osborne*, 102 Wn.2d at 99). This includes an obligation to inform the defendant of all *direct* consequences of the guilty plea. *Id*. at 187. Defense attorneys do not have to inform their clients of *all* possible consequences of a guilty plea, but counsel can perform deficiently by "affirmatively misinform[ing]" clients about collateral consequences that affect the defendant's "calculations about the costs and benefits of standing trial." *Id*. at 187-88.

In *Stowe*, defense counsel knew that the defendant "would rather risk a trial, and a potential lengthy prison sentence, than plead guilty and definitely face discharge from the military." *Id*. at 188. Counsel asked a military police liaison with no legal training stationed at the courthouse

9

whether Stowe could stay in the military if he entered an *Alford*[3] plea, and counsel reported the liaison's affirmative answer to Stowe without researching the applicable law. *Id*. at 185. In fact, the military does not distinguish between *Alford* pleas and other guilty pleas, and the Army dishonorably discharged Stowe immediately after he entered his plea. *Id*. Because it was clear that Stowe only seriously considered pleading guilty after "counsel led him to believe that an *Alford* plea would allow him to maintain his Army career," we held that counsel performed deficiently. *Id*. at 188. And "Stowe would have demanded a trial" without the erroneous advice, satisfying prejudice. *Id*. at 189.

An attorney providing misinformation to a defendant will not automatically render the defendant's guilty plea involuntary. *Id*. at 188. In particular, courts are less inclined to identify ineffective assistance based on misinformation when a defendant received accurate information before entering a guilty plea. We held that a defendant could not demonstrate ineffective assistance from counsel's assertion that the trial court was bound by the plea agreement sentencing recommendation because "the guilty plea statement and the court itself" told him "that the court could impose any sentence within the standard range." *In re Pers. Restraint of Reise*, 146 Wn. App. 772, 788, 192 P.3d 949 (2008). Thus, the defendant "was correctly informed about this consequence before he pleaded guilty." *Id*. *But see In re Pers. Restraint of Quinn*, 154 Wn. App. 816, 840-41, 226 P.3d 208 (2010) (allowing a defendant to withdraw his guilty plea due to affirmative misadvice that he would face 36 to 48 months of community custody instead of the statutorily mandated life term).

---

[3] *North Carolina v. Alford*, 400 U.S. 25, 91 S. Ct. 160, 27 L. Ed. 2d 162 (1970).

Brady relies on *State v. Williams*, which acknowledged that "'special care should be taken in reviewing guilty pleas entered in exchange for a prosecutor's promise of lenient treatment of a third party.'" 117 Wn. App. 390, 399, 71 P.3d 686 (2003) (quoting *State v. Cameron*, 30 Wn. App. 229, 231, 633 P.2d 901 (1981)). "[W]hen a court is informed that a plea is part of a package deal, the court must specifically inquire about whether the codefendant pressured the defendant to go along with the plea and carefully question the defendant to ensure he is acting of his own free will." *Id*. at 400.

In *Williams*, the prosecutor did not expressly inform the trial court that the pleas of the father and son codefendants were a package deal. *Id*. The father later asserted "that he felt pressured to enter into the plea agreement because he did not want his son to have a felony conviction." *Id*. at 401. But Division One concluded that the failure to alert the trial court was harmless for several reasons. The trial court clearly knew the pleas were a package deal, Williams "did not assert that there were any direct threats or promises by his son to induce him to plead guilty," and "evidence presented at the hearing on the guilty plea . . . clearly indicate[d] that the guilty plea was freely and voluntarily made." *Id*. "Although Williams was undoubtedly influenced at least in part by a desire to help his son, the desire to help a loved one and the accompanying emotional and psychological pressure do not, standing alone, render a guilty plea involuntary." *Id*. at 401-02.

B.    <u>Whether Brady Received Effective Assistance During Plea and Plea Withdrawal Proceedings</u>

Here, assuming without deciding that plea counsel preformed deficiently, Brady has not shown prejudice. "The voluntary nature of a defendant's guilty plea is not automatically destroyed because of erroneous advice by counsel." *Stowe*, 71 Wn. App. at 188.

The State charged Brady and Mills as codefendants and the trial court knew that the pleas were connected. However, there were no promises about Mills' sentence in Brady's plea offer or agreement. And Brady repeatedly asserted that there were no promises outside of his plea agreement that were inducing him to plead guilty. His stated basis for pleading guilty was that he sought to avoid conviction for a third strike offense that would have triggered a mandatory life sentence.

Further, although Brady clearly had an emotional investment in Mills receiving home confinement and was misinformed about the State's recommendation for her sentence, Brady knew from previous guilty pleas that the sentencing judge always has discretion to depart from even an agreed recommended sentence. Thus, he knew that there was never a guarantee that Mills would receive the sentence she requested. *See id*. Moreover, the trial court's comments that Mills' acts were "too serious" for home confinement indicate that the court would likely not have been swayed by the State's endorsement of home confinement. VRP (July 19, 2021) (Mills) at 15. The fact that Brady was disappointed by Mills' sentence does not, by itself, mean that his guilty plea was involuntary. *Reise*, 146 Wn. App. at 788; *Williams*, 117 Wn. App. at 401-02. The trial court did not abuse its discretion by denying Brady's motion to withdraw his guilty plea.

Brady next argues that his second attorney provided ineffective assistance regarding the motion to withdraw Brady's guilty plea. He contends that withdrawal counsel should have argued based on plea counsel's ineffective assistance instead of focusing on whether the State promised Brady that it would support Mills' request for home confinement. Brady reasons that the failure to raise an ineffective assistance argument was, itself, ineffective assistance. We disagree. Even had withdrawal counsel raised plea counsel's arguably deficient performance, the lack of prejudice

discussed above would have defeated that ineffective assistance argument if made below. Thus, the ineffective assistance claim regarding withdrawal counsel's performance also fails.

## II. CRIME VICTIM PENALTY ASSESSMENT

Brady also argues that we must remand for the trial court to strike the crime victim penalty assessment from his judgment and sentence because the assessment is no longer a mandatory legal financial obligation. He argues that a recent amendment to RCW 7.68.035 provides that trial courts shall not impose the penalty assessment on a defendant who was indigent at sentencing, and that the superior court made such a finding here. LAWS OF 2023, ch. 449, § 1. The trial court did find Brady indigent under RCW 10.101.010(3)(c). A new statute applies to all cases that were pending on direct appeal when the statute took effect. *State v. Jefferson*, 192 Wn.2d 225, 246, 429 P.3d 467 (2018). And the State does not object to remand for purposes of striking the penalty assessment. Accordingly, we remand for the trial court to strike the crime victim penalty assessment.

## CONCLUSION

We remand for the trial court to strike the crime victim penalty assessment from Brady's judgment and sentence. We otherwise affirm.

No. 56309-6-II

A majority of the panel having determined that this opinion will not be printed in the Washington Appellate Reports, but will be filed for public record in accordance with RCW 2.06.040, it is so ordered.

_Glasgow, C.J_

Glasgow, C.J.

We concur:

_Cruser, J._

Cruser, J.

_Che, J._

Che, J.